**UNITED STATES of America,**

v.

**Joseph CALABRIA.**

**Crim. No. 85–00112–02.**

United States District Court,
E.D. Pennsylvania.

July 9, 1985.

As Amended July 15, 1985.

188

Edward S.G. Dennis, Jr., U.S. Atty., Ewald Zittlau, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

Thomas Bergstrom, Philadelphia, Pa., for defendant.

## MEMORANDUM

BECHTLE, District Judge.

On Thursday, June 13, 1985, the court granted the government's motion to disqualify Walter M. Phillips, Jr., Esquire, from representing defendant Joseph Calabria. The reasons for the court's Order are as follows.

FACTS

Joseph Calabria ("Calabria") testified before a Federal Grand Jury on July 24 and July 25, 1984. The Grand Jury was seeking to determine whether General Electric Company ("GE") and any of its employees participated in a scheme to defraud the United States whereby overrun labor costs, which accrued under a fixed price incentive contract with the Air Force and were not reimbursable, were claimed as costs of other government contract work.[1] In the course of his testimony Calabria, the Grand Jury indictment alleges, made several knowingly false declarations in response to questions regarding matters material to the Grand Jury investigation. As a result, the Grand Jury indictment charged Calabria with violations of 18 U.S.C. § 1623.

---

1. The government reimbursed GE for all the costs which GE claimed to have incurred under these other government contracts.

In order to understand the pending criminal action, and the government's motion to dismiss Walter M. Phillips, Jr. ("Phillips"), a review of the facts underlying the indictment is helpful.

### A. *Allegations Set Forth in the Indictment*

At some time prior to the initiation of the Grand Jury investigation, GE and the United States Department of the Air Force entered into a series of contracts relating to parts of the Minuteman intercontinental ballistic missile, in particular, arming and fusing systems and re-entry vehicles.[2] The contracts provided for the development, manufacture, installation, and checkout of physical components ("hardware") and computer programs ("software") used to test automatically the reliability and condition of the arming and fusing system and its component parts.

Two contracts were relevant to the Grand Jury investigation. The first contract ("First Buy")[3] was for the fabrication, testing, installation, and checkout of hardware. The hardware facilitated the running of a software package for testing the reliability of the arming and fusing system.[4] The second contract[5] involved two buys in which GE was to develop and manufacture ("Second Buy") and install and checkout ("Third Buy") hardware and software for a system to test, repair, and maintain the individual components of the arming and fusing system.

The First Buy, a cost reimbursement contract, provided that the United States would reimburse GE all allowable costs incurred in the performance of the contract to the extent prescribed in the contract. It also established an estimate of total cost for the purpose of obligation of funds and established a ceiling price which GE could not exceed, without prior approval or subsequent ratification by the United States. Under the contract, GE was required to absorb costs sustained by GE in excess of the ceiling.

The Second and Third Buy contract was a fixed-price incentive contract. This contract provided for a target cost, a target profit, a target price, and a price ceiling. The United States agreed to reimburse costs to GE up to a target cost limit. In addition, the Air Force paid the target profit as a cost of GE under the contract. The contract provided, also, that the target cost plus the target profit was called the target price. Any costs incurred by GE over the target price, but under the ceiling price, were partially reimbursed by the United States. Any costs incurred by GE over the ceiling price were not reimbursable, and would have to be absorbed by GE.

Under the contracts, GE was required to segregate all costs incurred in the performance of each Buy and maintain accurate records of these costs. Costs identifiable with a specific Buy were charged to the specific individual task for which the cost was expended. Each specific individual task was assigned a "shop order" number. Other costs, such as those not identifiable with a specific contract, were expended on overhead projects and were charged to overhead shop order numbers. Labor costs were charged to each shop order. These labor costs were calculated from time cards prepared weekly by GE employees. GE was required by federal regulation to retain all time cards and other documents relating to costs so that bills could be sub-

---

2. The re-entry vehicle is the cone which carries the warhead to its target. Inside the re-entry vehicle is the arming and fusing system which causes the warhead to explode at the appropriate time.

3. The term "Buy" was used to designate the work for which, under the contract, compensation was to be paid in a particular fiscal year. The contracts, therefore, specified that costs for each Buy were to be segregated.

4. This Buy was concerned with Service Star interface adaptor units for the Service Star program.

5. This second contract pertained to the Depot Maintenance Ground Equipment/Aging and Surveillance test program and the Depot Maintenance Ground Equipment/Aging and Surveillance interactive adaptor units.

stantiated when audited by the United States and its departments and agencies.

When all work on a task was performed, the shop order for that particular task was closed. Information, collected from the shop orders, was used to prepare the bills or billings which were submitted to the Air Force for reimbursement.

On or about January 1, 1980, before the Second Buy was completed, GE's costs had already exceeded the ceiling set under the Second Buy, which meant that additional costs had to be absorbed by GE. In what appears to have been an effort to reduce the amount of GE's non-reimbursable costs on these contracts, GE, through its employees allegedly including defendant Joseph Calabria and Roy Baessler ("Baessler"), engaged in a plan to defraud the United States by claiming and causing reimbursement of costs to GE for over $800,000.00 in non-reimbursable overrun labor tasks performed on the Second Buy. In particular, when the cost ceiling on the Second Buy was approached or exceeded, substantial portions of the additional labor costs for the Second Buy were charged to other contracts, including the First Buy, the Third Buy, and an overhead claim, all of which were, at the time, either below their cost ceiling or were directly or indirectly reimbursable by the United States.

The mischarging scheme was carried out by a variety of methods. For example, shop orders for the Second Buy were closed months before the work or tasks assigned to the shop orders were complete. As a result, GE employees were not able to charge their time to the correct Buy. In another technique used to accomplish the scheme, GE, its managers, and employees, directed that labor hours billed on time cards be changed from the Second Buy to the Third Buy.

On March 28, 1984, a federal Grand Jury was impanelled to investigate possible violations of federal criminal laws in the Eastern District of Pennsylvania, including violations of 18 U.S.C. §§ 287 and 1001. In the course of its investigation, the Grand Jury called Joseph Calabria and Roy Baes-

sler as witnesses. Both Calabria and Baessler testified under grants of immunity. Calabria was the GE manager of the 9610 group of engineers and was chief engineer with respect to certain tasks in the Second Buy. Also, it was Calabria's responsibility to close shop orders of groups in the 9500 series. Baessler was the manager of the 9566 group of engineers and was chief engineer with respect to other tasks in the Second Buy.

Before the Grand Jury, Calabria testified (1) that he did not close nor did he know who closed shop orders for the Second Buy for the 9560 group before the work was completed, and (2) that, when he ordered labor costs billed on Lester Cohen's ("Cohen") time card for fiscal week 29 changed from the billing of the Second Buy to the Third Buy, he was not aware that Cohen was working on the Second Buy.

According to the Grand Jury indictment, when Calabria testified before the Grand Jury, (1) Calabria knew that he himself had closed or caused to be closed the shop orders for the Second Buy for the 9560 group before the work was completed, and (2) Calabria knew that Cohen was working on the Second Buy and that the time card was correct as originally submitted by Cohen. In addition, according to the indictment, these facts were significant to the Grand Jury investigation.

### B. *Facts Not Alleged Nor a Part of the Indictment*

Walter Phillips, Jr., Esquire, has represented many of GE's officials and employees before the Grand Jury. In fact, GE has paid Phillips through the period in which Phillips represented those officials and employees before the Grand Jury until the present time. In the meantime, on May 13, 1985, GE entered a plea of guilty to 108 counts of the Indictment.

GE's officials and employees, whom Phillips represented before the Grand Jury, include Calabria, Baessler, Cohen, William Kinney ("Kinney"), Thomas Barrett ("Barrett"), Kenneth Lies ("Lies"), John Ellis

("Ellis"), Michael Boyle ("Boyle"), and John Renz ("Renz"). Of these individuals, only Calabria and Baessler were indicted under 18 U.S.C. § 1623 for false declarations before the Grand Jury. The charges against Baessler have subsequently been dropped.

The government expects Baessler, Kinney, Barrett, Lies, Cohen, Ellis, Boyle, and Renz to all testify on behalf of the government in the criminal action against Calabria. None of the government's prospective witnesses continue to be represented by Phillips.

Each of these prospective witnesses, except Baessler, has said under oath in open court that each knowingly and voluntarily waives his attorney-client privilege for purposes of cross-examination by Phillips at Calabria's trial. Baessler has refused and continues to refuse to waive his attorney-client privilege.

An offer of proof submitted by the government with respect to Baessler's prospective testimony at trial indicates that Baessler will give circumstantial evidence which will, at least, marginally indicate, and, at most, establish that Calabria's answers concerned a material matter, that Calabria must have known who closed the shop order for the 9560 group before the work was completed, and that Calabria knew that Cohen was working on the Second Buy and Cohen's time card for fiscal week 29 was correct as submitted.

The government moves to disqualify Phillips. The government asserts that (1) because Phillips is paid by GE, Phillips is not independent and cannot be effective counsel for Calabria, and (2) because Phillips is hindered by his duty to Baessler, his former client, Phillips cannot effectively cross-examine and impeach Baessler.

Phillips, on the other hand, cannot perceive any conflicts of interest hindering his effective and zealous representation of Calabria. First, Phillips finds no conflict of interest or impropriety in his representation of Calabria while Phillips is being paid by GE. Second, Phillips, conceding that he cannot impeach Baessler, argues that the best defense tactic is to show Baessler has no personal knowledge because Baessler was on vacation when the 9560 group shop order was closed and when Cohen's time card was corrected. Phillips believes, therefore, that he need not impeach Baessler and his duty to Calabria does not conflict with his duty to Baessler.

Calabria maintains that he understands his rights to competent and independent counsel. Calabria states, however, that he has complete confidence in Phillips, whether or not Phillips' representation was hindered by Phillips' duty to Baessler. In addition, Calabria said that in order to keep Phillips as his attorney, Calabria was willing to hire another attorney to cross-examine Baessler, to waive his right to cross-examine Baessler. He says that he will also waive his right to appeal an adverse verdict on the ground that his attorney's representation was ineffective.

## DISCUSSION

█ The court must not arbitrarily or lightly interfere with a defendant's choice of counsel. *United States v. Flanagan,* 679 F.2d 1072, 1076 (3d Cir.1982), *rev. on other grounds,* 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984). For example, if defendant's attorney's alleged conflict of interest is highly speculative, the court will not disqualify the attorney on the grounds of his conflict of interest. Where, however, an attorney's judgment in handling a case is actually or is likely to be tainted or limited by a conflict of interest, the court should disqualify him. *Id.* Three considerations provide the basis of this rule. First, courts must be concerned with seeing that defendants are provided with their Sixth Amendment right to effective counsel.[6] Second, the court must be concerned with judicial integrity. Third, the court, through its supervisory powers, must make

---

6. Representation of a defendant by an attorney burdened by a prejudicial conflict of interest "will constitute a constitutionally defective denial of effective assistance of counsel." *Walker v.* *United States,* 422 F.2d 374 (3d Cir.), *cert. denied,* 399 U.S. 915, 90 S.Ct. 2219, 26 L.Ed.2d 573 (1970).

an effort to see that the ethical standards of the legal profession are preserved.

An attorney may have a conflict of interest when one party pays the fees for the attorney to represent another party. Model Code of Professional Responsibility, DR 5–107 (the "Code"). The Code does permit, however, the attorney to accept compensation from one other than his client with the client's consent after full disclosure. *Id.*

■■■ Conflict of interest concerns arise also when an attorney must prepare a case against, cross-examine, or impeach a former client on subject matter "so closely connected with the subject matter of the earlier representation that confidences might be involved." *Richardson v. Hamilton International Corporation,* 469 F.2d 1382, 1384 (3d Cir.1972); *United States v. Dolan,* 570 F.2d 1177 (3d Cir.1978). The source of this conflict is the duty owed by each attorney to each of his clients to preserve all confidential attorney-client communications. This attorney-client privilege applies when:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass. 1950).

■■ In order to assert the privilege, the holder of the privilege has the burden of affirmatively raising and demonstrating to the court the elements of the privilege. The court must, however, conclusively presume the existence of specific attorney-client confidences, in attorney disqualification cases, because the court cannot "actually inquire about the matter without thereby ... destroying the confidences." *United States v. Provenzano,* 620 F.2d 985, 1005 (3d Cir.1980).

■■ The attorney's duty to preserve the confidences of his client does not end when the attorney-client relationship ends. The attorney continues to be obligated to protect his former client's privileged communications until he is released from the duty. *See* Model Code of Professional Responsibility, Canon 4.

■■ The defendant may waive his Sixth Amendment [7] right to effective assistance of counsel if the waiver is knowing and voluntary. *United States ex rel. Hart v. Davenport,* 478 F.2d 203 (3d Cir.1973). In order for the waiver to be knowing and voluntary, the court must be satisfied that the defendant, at the time of the waiver, is aware of all the foreseeable prejudices and detrimental consequences which may result therefrom. *Dolan,* 570 F.2d at 1181.

■■ Turning now to the application of these legal principles to the facts, the court has concluded, after three hearings and many hours of deliberation, that Phillips must be disqualified. Two independent grounds support this conclusion: (1) Phillips' duty to Baessler not to disclose confidential communications hinders Phillips' pretrial decision-making and preparation; and (2) at trial, there is strong likelihood that Phillips' duty to Baessler will materially hinder Phillips' defense of Calabria.

7. The Sixth Amendment of the United States Constitution provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

Phillips does not contest that his former representation of Baessler will limit his ability to impeach Baessler at trial. Instead, Phillips has already decided that Calabria's best defense against Baessler's testimony (which he has not heard) will be to limit its harmful effects and Phillips believes that cross-examination of Baessler will indicate that Baessler was on vacation when the time cards were altered and the shop orders closed (which is presumably not privileged information). Phillips concludes that since cross-examination will indicate that Baessler was not present when the time cards were altered or when the shop orders were prematurely closed, the jury will disregard, rather than disbelieve, Baessler's testimony that Calabria knew that Cohen was working on the Second Buy during fiscal week 29 or that Calabria was responsible for closing the shop orders.

The difficulty with Phillips' argument is that he has tailored Calabria's defense in advance of the trial in a way that is the only way to avoid his professional disabilities arising out of previous representation of the government's chief witness, Roy Baessler. This simply reverses the priorities that the attorney owes to his client because it puts the lawyer's concerns ahead of the defendant's needs and then shapes the defendant's needs to eliminate the attorney's problems created by a direct conflict of interest. The court must determine whether Calabria's attorney can be independent without considering which trial tactic is defendant's best tactic. The court has neither the ability nor the authority to pick and choose which strategy is best or will be best in Calabria's case. What the court is sure of, however, is that to have to give up before trial the major traditional strategy of impeaching a key prosecution witness in a criminal case simply because that witness was a former client is a very disturbing development. It is true that in some circumstances the best cross-examination is no cross-examination. It is also true that every adverse witness does not have to be impeached or contradicted. It is not true, however, that these decisions are best made in a case such as

this before trial. In preparation for trial, Calabria's attorney should be able to develop all of Calabria's defenses, unhindered by a duty to a former client. Phillips may be correct that Calabria's best defense is not to impeach Baessler, but he could easily be wrong. In any event, whether he is right or wrong cannot be decided until Baessler testifies, at the earliest.

All lawyers worth their salt know that as evidence develops at trial, trial strategies frequently emerge and change as a defense tracks the evidence offered against a defendant. Baessler's testimony alone may be sufficient to convict Calabria. If, in that circumstance, Phillips is unable to impeach his former client because of the risk that he may be using confidential information to do so, he has deprived his client of what may be the only argument to the jury Calabria has in his favor. A defense attorney not having formerly represented Baessler would have the right to probe and inquire and examine in detail Baessler's role and the foundation for his testimony. Some of this may have been disclosed to Phillips, but this will not be a disability to a new attorney because he will not be barred even if some of the information that he develops might also have been unavailable to Phillips because it had been disclosed to Phillips prior to trial by Baessler as a confidential communication.

With respect to Calabria's waiver of his rights to confront Baessler, to cross-examine Baessler, and to appeal a guilty verdict for ineffective assistance of counsel, the court finds that Calabria is not aware of the foreseeable prejudices his attorney's continued representation will entail for his trial and the possible detrimental consequences of these prejudices. *Dolan,* 570 F.2d at 1181. If Baessler's testimony is as damaging to Calabria's case as it is expected by the government to be, and if Phillips is deprived of a full range of cross-examination of Baessler because of prior representation, the court can only conclude that there is a direct conflict of interest in continued representation and not merely a suspicion or a speculative conflict and, accord-

ingly, the court need not accept, and does not accept, Calabria's waiver of his right to have Phillips continue to represent him despite a disclosure of the prior representation of Baessler by Phillips. *See United States v. Dolan, supra.*

The court finds without merit the suggestion that the court should allow Calabria to employ supplemental counsel for the purpose of cross-examining Baessler. This would be awkward, confusing to the jury, a fragmentation of the defendant's right to a strong unified defense, and of doubtful effectiveness.

## CONCLUSION

For the above reasons, on June 13, 1985, the court ruled from the bench that Walter M. Phillips, Jr., Esquire was disqualified from representing Joseph Calabria in the above captioned criminal action. It was the court's concern then, as it is now, that Calabria's rights, inherent and necessary rights in the adversial judicial process, be preserved for trial.