UNITED STATES of America, Plaintiff,

v.

John GOTTI, et al., Defendants.

No. CR–90–1051.

United States District Court,
E.D. New York.

Aug. 1, 1991.

John Gleeson, Asst. U.S. Atty., Brooklyn, N.Y., for plaintiff.

Samuel H. Dawson, Gallop, Dawson, Clayman & Rosenberg, New York City, for Bruce Cutler.

Herald Price Fahringer, New York City, for Gerald L. Shargel.

Victor J. Rocco, Gordon, Hurwitz, Butowsky, Witzen, Schlov & Wein, New York City, for John L. Pollok.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

The government has moved this court for an order disqualifying Gerald Shargel, Bruce Cutler and John Pollok from representing any of the defendants in this case at trial. The motion is based upon the assertion that there are several actual and numerous potential conflicts of interest to which their continued participation would give rise and that those conflicts can neither be waived nor remedied except by disqualification. The government alleges that the inevitability of their disqualification must follow from the assertions that:

1. The named attorneys are "house counsel" to the "enterprise" charged in the indictment, namely, the Gambino Organized Crime Family, and that their representation of and services to various members of that enterprise whose obligations for legal fees were paid by John Gotti will be "part of the proof of the association-in-fact charged in the indictment." Their presence at trial will, therefore, violate DR 5–102(A) of the American Bar Association's Code of Professional Responsibility.

2. The named attorneys, and more specifically Shargel and Cutler, were witnesses to various events of significance that will be proved at trial also requiring their disqualification from participating in the trial pursuant to DR 5–102(A).

3. Shargel and Cutler previously represented their predecessor as "house counsel," who will be an "important government witness." Pollok has also previously

represented another prospective government witness. Both witnesses were represented by one or more of those attorneys during their testimony, before the grand jury in this case.

4. The insinuation of their own improper conduct could inhibit their pursuit of a vigorous defense on behalf of their clients who will thus be deprived of representation by conflict free counsel.

## INTRODUCTION

The superseding indictment contains thirteen counts which will be summarized briefly. The defendants are charged in Count One with violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), unlawfully conducting and participating in the conduct of the affairs of an enterprise through a pattern of racketeering activity. The "enterprise" is alleged to be the Gambino Organized Crime Family of La Cosa Nostra. The predicate acts of racketeering are, as to one or more of the defendants, alleged to be the conspiracy to murder and the murder of Paul Castellano (John Gotti); the murder of Thomas Bilotti (John Gotti); the conspiracy to murder and the murder of Robert DiBernardo (John Gotti and Salvatore Gravano); the conspiracy to murder and the murder of Liborio Milito (John Gotti and Salvatore Gravano); the solicitation of murder of Louis DiBono (Salvatore Gravano); the conspiracy to murder and the murder of Louis DiBono (John Gotti, Frank Locascio and Salvatore Gravano); the conspiracy to murder Gaetano Vastola (John Gotti, Frank Locascio and Salvatore Gravano); illegal gambling business in New York (John Gotti, Frank Locascio and Salvatore Gravano); illegal gambling business in Connecticut (John Gotti, Frank Locascio, Salvatore Gravano and Thomas Gambino); loansharking conspiracy (John Gotti, Frank Locascio, Salvatore Gravano and Thomas Gambino); extortionate collections of credit (John Gotti, Frank Locascio, Salvatore Gravano and Thomas Gambino); obstruction of justice—the Thomas Gambino trial (John Gotti); obstruction of justice—the Castellano murder investigation (John Gotti, Frank Locascio and Salvatore Gravano). In Count Two they are charged with racketeering conspiracy and bribery as a predicate act. Counts Three through Twelve charge the substantive offenses listed in Count One as predicate acts. Count Thirteen charges John Gotti and Frank Locascio with conspiring to defraud the United States in connection with the collection of income taxes.

That indictment was the result of an extensive investigation of the named defendants and of a group of individuals alleged to be associated in fact as the Gambino Organized Crime Family of La Cosa Nostra, characterized in that document as an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1959(b)(2). The investigation entailed visual surveillance of many persons and places; gathering, analyzing and appraising the value of information supplied by persons familiar with the targets of the investigation and their activities and electronic surveillance.

The electronic surveillance was conducted pursuant to the authority of orders issued in accordance with 18 U.S.C. §§ 2510–2521 by Judge Duffy of the United States District Court for the Southern District of New York on September 25, 1989. Those orders authorized the interception of oral communications and visual, non-verbal conduct of John Gotti, Jack D'Amico, Frank Locascio, Salvatore Gravano and others as yet unknown at specified locations in and about the Ravenite Social Club, 247 Mulberry Street, New York, New York and at Scorpio Marketing, 229 West 36th Street, New York, New York. Many conversations were intercepted and recorded. The defendants sought to suppress the fruits of that electronic surveillance, asserting violations of constitutional dimension, the violation of statutes and of common law principles. The briefs, affidavits, transcripts, prior decisions, orders and other assorted documents submitted by each side in support of and against the motion to suppress can fairly be described as voluminous. That motion was denied in a Memorandum and Order issued on July 19, 1991.

The *motion to disqualify counsel* is predicated to a very large extent upon the electronically intercepted conversations. Pending the resolution of the motion to suppress the interceptions, defense counsel urged the court not "to rush to judgment" on the disqualification motion for the reason, among others, that that motion "should not be decided before it is known whether the Title III surveillance can pass constitutional muster." (Letter from Gerald L. Shargel to the court dated March 5, 1991.) The court acceded to this urging, and having determined that the electronic surveillance does pass constitutional muster, now turns to this motion to disqualify.

## STATEMENT OF FACTS

### A. *The Attorneys as "House Counsel" for the Enterprise*

The factual bases upon which the government relies for this and the other grounds for disqualification are excerpts of intercepted conversations, the accuracy of which is not controverted in the defendants' submissions in opposition and which are set out in the Government's Memorandum in Support of its Motion for an Order Disqualifying Counsel ("Gov't Mem.") at 10–52. Those excerpts will be summarized in part and reproduced verbatim in part as is deemed appropriate.

John Gotti described the commencement of his relationship with Gerald Shargel and, after complimenting him on his legal ability, assured him that "our friends will use you." Thereafter, "two guys took him on right away" and "I brought him six." (Gov't Mem. at 10–11.)

At another time Gotti is heard to say to Gravano:

Some of them love us because we did put them on the map. I remember Gerry when Gerry was an ambulance chaser.

(Gov't Mem. at 28.)

He also described the commencement of his relationship with Bruce Cutler (Gov't Mem. at 12) who, at the time, was associated with Barry Slotnick:

Bruce, I don't know him all my life. I know him five years.... Without us he wouldn't be on the map.

(Gov't Mem. at 28.)

In a subsequent conversation between John Gotti, Salvatore Gravano and Frank Locascio, Gotti expressed displeasure at the amounts of money he was paying his lawyers, in these words:

You know these are "rats" Sam. And I gotta say, they all want their money up front. And then you get four guys that want sixty-five, seventy-five thousand apiece, up front. You're talking about three hundred thousand in one month....

I paid 135,000 for their appeal. For Joe Gallo and, and "Joe Piney's" appeal, I paid thousands of dollars to Pollok. That was not for me.

(Gov't Mem. at 13.)

Then I gave him 25,000 for Carneg's.... Johnny's a wealthy kid, thank God, and he, he don't want none of my money. But he refused to pay. So there wasn't even no appeal. What, what do we do? So, I says, "What do you mean? How much is it?" Gerry can tell you. He says, "25." "Well, you got it. Pete, bring him 15. And then, you got ten in two weeks.... The other guy's appealing. I'm paying John, I paid his 50.

(Gov't Mem. at 14.)

I gave youse 300,000 in one year. Youse didn't defend me. I wasn't even mentioned in none of these * * *[1] things. I had nothing to do with none of these * * * people.... What the * * * is your beef? ... Before youse made a court appearance, youse got 40,000, 30,000 and 25,000. That's without counting John Pollok.... You standing there in the hallway with me last night, and you're plucking me.... "Tony Lee's" lawyer but you're plucking me. I'm paying for it.... Where does it end? Gambino Crime Family? This is the Shargel, Cutler and who do you call it Crime Family.

(Gov't Mem. at 14–15.)

Later on during the course of this conversation and after dissatisfaction with

---

1. " * * * " indicates expletive deleted.

their lawyers is expressed by each ("They're overpriced, overpaid and under-performed ... and they ain't got the balls to do what they gotta do." (Gov't Mem. at 15)), Gotti is heard to say:

> Don't you know why they ain't got the balls, too? I told them yesterday, I told them why.... You don't get up and holler when you could because nothin' you could do. You can't even come to court six hours. You write a stay and you're out automatically. They got you for six hours, tops, they keep you. You don't wanna do it because, you * * * you know and I know that they know that you're taking the money under the table. Every time you take a client, another one of us on, you're breaking the law.
>
>     *     *     *     *     *     *
>
> If they wanna really break Bruce Cutler's balls, what did he get paid off me. He ain't defending me three years ago. I paid tax on 36,000. What could I have paid him?
>
>     *     *     *     *     *     *
>
> You, you see me talk for ten minutes in the hall? What do we talk about? Nothing. I say "Go find out information what's going, when, when the 'pinch' is coming, you * * * " "You're making me

an 'errand boy.' " High-priced errand boy. Bruce, worse yet!

(Gov't Mem. at 16–17.)

The government lists twenty cases[2] in which the attorneys represented persons who the government asserts are associated with John Gotti and the Gambino Organized Crime Family.

Michael Coiro and Anthony Gurino will be government witnesses. For a period of approximately twenty years, Coiro represented John Gotti and many of his associates in a variety of criminal cases. He himself was represented by Shargel and Cutler. Pollok previously represented Gurino. As regards the representation of Coiro by Shargel and Cutler, in an affidavit dated January 17, 1991 by Patrick Cotter, an Assistant United States Attorney, the government proffers that Michael Coiro will testify that he never compensated in any way either Shargel or Cutler for representing him in pretrial proceedings, at trial, at sentencing and on appeal in *United States v. Ruggiero, et al.*, 83–CR–412 (E.D.N.Y.), in which Coiro was a defendant. Coiro will testify that when it became apparent that Shargel could not represent him at trial due to a scheduling conflict, Coiro went to Gotti with that problem and was subsequently represented by Cutler at trial. Coiro will also testify that he did not

---

**2.** *U.S. v. Ruggiero, et al.*, 83 CR 412 (E.D.N.Y.) (Michael Coiro represented by Shargel, Cutler); *Grand Jury* (this case, Michael Coiro represented by Shargel); *U.S. v. Ruggiero, et al.*, (John Carneglia represented by Shargel, Pollok); *U.S. v. Ruggiero, et al.*, 83 CR 412 (E.D.N.Y.) (Angelo Ruggiero represented by Pollok); *U.S. v. Gallo, et al.*, (Angelo Ruggiero represented by Pollok); *People v. Gotti*, No. 358/89 (N.Y. County) (Angelo Ruggiero represented by Shargel); *U.S. v. Gallo, et al.*, 86 CR 452 (E.D.N.Y.) (John Corrao represented by Shargel); *U.S. v. Russo, et al.*, 906 F.2d 77 (2d Cir.1990) (John Corrao represented by Shargel); *U.S. v. Gambino, et al.*, 89 CR 431 (E.D.N.Y.) (John Corrao represented by Shargel); *U.S. v. Gallo, et al.*, 86 CR 452 (E.D.N.Y.) (Joseph N. Gallo represented by Pollok); *U.S. v. Gallo, et al.*, 86 CR 452 (E.D.N.Y.) (Joseph Armone represented by Pollok); *People v. Gotti, et al.*, No. 358/89 (N.Y. County) (Anthony Guerrieri represented by Shargel); *U.S. v. Gambino, et al.*, 89 CR 431 (E.D.N.Y.) (George Remini represented by Shargel); *U.S. v. Remini*, 90 CR 964 (E.D.N.Y.) (George Remini represented by Pollok); *Grand Jury* (this case) (Salvatore

Gravano represented by Shargel); *U.S. v. Gravano*, 85 CR 271 (E.D.N.Y.) (Salvatore Gravano represented by Shargel); *U.S. v. Squitieri, et ano.*, 87 CR 198 (D.N.J.) (Arnold Squitieri represented by Shargel); *U.S. v. Squitieri, et ano.*, 87 CR 198 (D.N.J.) (Alphonse Sisca represented by Pollok); *U.S. v. Ruggerio, et al.*, 83 CR 412 (E.D.N.Y.) (Anthony Gurino represented by Pollok); *Grand Jury* (this case) (Anthony Gurino represented by Pollok); *U.S. v. Gigante, et al.*, 90 CR 446 (E.D.N.Y.) (Peter Gotti represented by Cutler); *U.S. v. Gambino, et al.*, 88 CR 919 (S.D.N.Y.) (John Gambino represented by Pollok); *U.S. v. Gambino, et al.*, 88 CR 919 (S.D.N.Y.) (Joseph Gambino represented by Cutler, Pollok); *U.S. v. Gambino, et al.*, 88 CR 919 (S.D.N.Y.) (Matteo Romano represented by Shargel); *U.S. v. Dellacroce, et al.*, 85 CR 178 (E.D.N.Y.) (Armand Dellacroce represented by Shargel); *U.S. v. Dellacroce, et al.*, 85 CR 178 (E.D.N.Y.) (Charles Carneglia represented by Shargel); *U.S. v. Coonan*, 87 CR 247 (S.D.N.Y.) (James Coonan represented by Shargel); *U.S. v. Gravano*, 88 CR 271 (E.D.N.Y.) (Edward Garafola represented by Pollok).

compensate Shargel in any way for representing him in connection with his appearances before the grand jury in this case. Attorney's fees for Gallo, Armone, Carneglia and Guerrieri were paid by Gotti.

There are additional conversations from which the only conclusions to be drawn are that the lawyers represent not merely an individual client, but the enterprise with which that individual is associated and receive instructions calculated to further the interests of that enterprise. One or two excerpts will suffice to demonstrate the point. In a conversation on November 28, 1989, Gotti, unhappy with the content of Jerry Capeci's column in the Daily News, portions of which he attributed to Shargel, was heard to say:

> Gerry came down. I gave him a little blast last night.... He admits he told him things in the past, this Capeci. But he thought he was being helpful.
> But ... we'll give him the benefit of the doubt.... I told Gerry. Gerry said, "Listen John, you know I got one love, you." "Good, all well and good. But let me tell you something," I told him "you know I ain't got one love," I told him, "you know how I feel, Gerry. I wanna know the truth about everybody. I'll help everybody."

(Gov't Mem. at 22.)

In a conversation on January 24, 1990, Gravano is heard to tell Gotti:

> Mister Gambino, ... Tommy grabs me when he walks in. So he says, "I got a message." "From whom?" "Johnny Gambino," he says. "They understand that you were reaching out for him. He's almost under like a house arrest," he says. "I got in touch with him. He'd like to make an appointment. If youse wanna see him, in the lawyer's office." ... [Y]ou want me to meet him in the lawyer's office, I'll meet him Wednesday.

(Gov't Mem. at 23.)

B. *The Attorneys as Witnesses to Events Which May be the Subject of Proof at Trial*

During the course of the trial of Thomas Gambino who was indicted for giving false, evasive and misleading grand jury testimony, subpoenas were served on John Gotti, Joseph Corrao and George Remini. Gotti anticipated that immunity orders would be obtained in regard to their testimony. Gambino was represented by Michael Rosen; Corrao and Remini were represented by Gerald Shargel. Racketeering Act Eleven and Count Eleven of the Superseding Indictment arise out of those events. They charge John Gotti and others with obstructing justice by unlawfully persuading and intimidating others not to testify in that case. Intercepted conversations were offered by the government to establish that the lawyers and others suggested that contempt for refusing to testify pursuant to the trial subpoenas could be avoided by having Gambino plead guilty. The excerpts of those conversations reflect Gotti's veto of that suggestion and his direction to Gambino and his lawyer to fight the case. Gotti, indicating that he, Corrao and Remini stood ready to go to jail, stated: "Get my cell ready; get Joe Butch's' cell ready, and get Fat Georgie's cell ready. And nobody is taking the stand. Tell them to go fight! Don't worry about it." (Gov't Mem. at 31–32.)

The determination by Gotti that no one will testify in the Gambino case gave rise to an ancillary concern, captured on this excerpt of a conversation in the hallway of 247 Mulberry Street on November 8, 1989:

> So now everybody was there, Bruce Cutler. And I told him, I says "What about 'Joe Butch?' Is he one of my guys?" He said, "What do you mean?" I says, "His bail pending appeal condition is that he doesn't commit another crime. Refusing to ... answer immunity is a crime punishable by five years." Bruce Cutler goes, "Gee ... I hadda take—Gerry Shargel goes, "Gee, I didn't think about it. You might be right." ... "He paid you the hundred thousand and I gotta be right." ... But I don't know if it's true. They're gonna look up the statute today. But I think it's true. If it's true, we lose.... No way he'll get the bail. But what are you gonna do? This is us.

(Gov't Mem. at 33–34.)

Excerpts of other conversations reflect counsel's awareness of Gotti's resolve that

Corrao and Remini commit the crime of contempt and of Gotti's effort to assure Remini that he would not be indicted if he did. (Gov't Mem. at 34–36.) Excerpts also reflect Gotti's resolve that the lawyers understand that their concern must be not only for their client, but that they "got no right [to] jeopardize other people" by their representation. "Who you working for?" he asked Shargel. "Did I tell you to do this?" (Gov't Mem. at 37–38.)

A conversation between Gotti and Cutler on March 29, 1990 concerning the prospective appearance of Anthony Rampino before the grand jury is probative of obstruction of justice charged in Count Eleven of the Superseding Indictment and raises the spectre of a patent conflict arising from Cutler's presence at events sought to be proved at trial. Other portions of that conversation, at which Gravano was also present, implicate Cutler as a medium through which messages are to be transmitted between Gotti and Raymond Patriarca, Jr. of Rhode Island and are probative of the existence of an enterprise. Cutler is thus once again cast in the role of a potential witness to rebut inferences which may logically and reasonably be drawn from those conversations. (Letter dated July 18, 1991 and attachments thereto from John Gleeson to the court.)

Excerpts of other conversations to which Shargel or Cutler or both were parties or during which they were present, not one of which is shrouded in a cloak of privilege, are relevant to the charges in the indictment and concerning which their testimony would be significant. (Gov't Mem. 38–52.)

One illustration may suffice. Gotti learned that Coiro declined to speak on his own behalf prior to being sentenced. Gotti was critical of Coiro for remaining silent and was heard to say:

> ... so he should'a spoken ... for himself. There's reasons why we don't say nothing. We're sworn not to say nothing. Even when we're ... 100 percent innocent, we're sworn not to say anything. And you sit there and take it on the chin. But he's not. He's an officer of the court. I mean, he chose that, didn't he? So he gets up and he speaks like one.

(Gov't Mem. at 48.)

## DISCUSSION

I begin this discussion with the deep sense of humility a judge reading *United States v. Wheat*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) must inevitably feel. I paraphrase, as indicated, that portion of the opinion to which I refer:

> Unfortunately for all concerned, a district court must pass on the issue of whether [to disqualify counsel for a criminal defendant] not with the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interests are notoriously hard to predict, even for those thoroughly familiar with criminal trials.

*Id.* at 162–63, 108 S.Ct. at 1699.

I am also conscious at the outset of the recognition by the Court that the government may seek to invent reasons for disqualification "to prevent a defendant from having a particularly able defense counsel at his side," *id.* at 163, 108 S.Ct. at 1699; that I "must recognize a presumption in favor of petitioner's counsel of choice, ... that ... may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Id.* at 164, 108 S.Ct. at 1700. I am conscious too of the observation of Justice Marshall in dissent that "[a]n obviously critical aspect of making a defense is choosing a person to serve as an assistant and representative." *Id.* at 166, 108 S.Ct. at 1700. And of Justice Stevens' reminder in his dissent "of the function of the independent lawyer as a guardian of our freedom." *Id.* at 172, 108 S.Ct. at 1704. Why then, am I driven to the conclusion that the government's motion to disqualify Cutler, Shargel and Pollok must be granted? I begin with a review of general principles.

The Sixth Amendment to the constitution which is the core of this motion guarantees that "[i]n all criminal prosecutions, the ac-

cused shall ... have the Assistance of Counsel for his defense." A plain reading of that guarantee does not support the interpretation that the accused shall have the assistance of counsel of his choice. It is, however, late in the day to gainsay the fact that "the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932). That is not to say that the right to counsel of choice is absolute. It is not. What then, is the purpose of the Sixth Amendment and what are the qualifications of the right it guarantees?

The Court in *Wheat* provided the answers to those inquiries. It wrote:

> We have ... recognized that the purpose of providing assistance of counsel "is simply to ensure that criminal defendants receive a fair trial," *Strickland v. Washington*, 466 U.S. 668, 689 [104 S.Ct. 2052, 2065, 80 L.Ed.2d 674] (1984), and that in evaluating Sixth Amendment claims, "*the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.*" *United States v. Cronic*, 466 U.S. 648, 657, n. 21 [104 S.Ct. 2039, 2046, n. 21, 80 L.Ed.2d 657] (1984). *Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.* See *Morris v. Slappy*, 461 U.S. 1, 13–14 [103 S.Ct. 1610, 1617–18, 75 L.Ed.2d 610] (1983); *Jones v. Barnes*, 463 U.S. 745 [103 S.Ct. 3308, 77 L.Ed.2d 987] (1983).

486 U.S. at 159, 108 S.Ct. at 1696–97 (emphasis added). The Court went on to consider the various respects in which the right to counsel of one's choice is circumscribed. Among those are the inability to choose as a lawyer one who is not a member of the bar; the inability to insist upon being represented by a lawyer he can't afford or who declines to represent him; the inability to insist upon the representation of a lawyer who had a previous relationship with an opposing party; and the inability to insist upon representation by an attorney who has a conflict of interest, as where the attorney represents multiple defendants. The Court rejected the view that the Sixth Amendment presumption of counsel of choice compels the acceptance of a defendant's knowing waiver of his lawyer's conflict of interest. It stated:

> [N]o such flat rule can be deduced from the Sixth Amendment presumption in favor of counsel of choice. Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.... Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation.

*Id.* at 160, 108 S.Ct. at 1697–98.

Justice Marshall, in his dissent, echoed that view in observing that:

> The right to counsel of choice, as the Court notes, is not absolute. *When a defendant's selection of counsel, under the particular facts and circumstances of a case, gravely imperils the prospect of a fair trial, a trial court may justifiably refuse to accede to the choice.*

*Id.* at 166, 108 S.Ct. at 1700 (emphasis added).

In speaking of "the institutional interest in the rendition of just verdicts" and of "gravely imperil[ing] the prospect of a fair trial" there can surely be no disagreement that the government, no less than the defendant, is entitled to a just verdict and a fair trial.

Before turning to the application of the principles reviewed to the facts underlying this motion, I feel constrained to make reference to one further observation made by the court in *United States v. Dolan*, 570 F.2d 1177, 1184 (3rd Cir.1978), which the Court in *Wheat* quoted approvingly:

"[W]hen a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen ·counsel to conform with the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. *Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court,* but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems implicating the defendants' comprehension of the waiver."

*United States v. Wheat,* 486 U.S. at 162, 108 S.Ct. at 1698–99 (emphasis added).

A. *The Role of Attorneys as House Counsel*

■ The significance of the government's assertion of this basis for disqualifying counsel is inexorably tied to Count One of the indictment, which charges the defendants with unlawfully conducting the affairs of an enterprise through a pattern of racketeering activity. In a leading and oft-cited case, the Supreme Court defined an "enterprise" for purposes of the RICO statute as "an entity ... [or] group of persons associated together for a common purpose of engaging in a course of conduct" which is unlawful, and went on to hold that an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981).

■ Excerpts of tape recorded conversations which have been set out above may leave a jury with little doubt that Gotti paid significant sums of money for legal services rendered to others. He is heard to say that he paid "thousands of dollars to Pollok that was not for" him; that he paid the attorneys for prosecuting the appeals of Joe Gallo, Joe Piney and John Carneglia; that he gave the lawyers $300,000 in one

year to defend cases in which he wasn't even mentioned. Evidence of these "benefactor payments" are relevant to prove a relationship between the benefactor and his beneficiaries and "highly relevant to whether the benefactor is the head of a criminal enterprise as defined by the RICO statute." *United States v. Simmons,* 923 F.2d 934, 949 (2d Cir.1991); *In re Grand Jury Subpoena Served Upon John Doe,* 781 F.2d 238, 251 (2d Cir.) (en banc) ("Moreover, payment for legal representation may be a form of compensation to members of a crime 'crew'."), *cert. denied,* 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986).

In an insightful footnote, an en banc court in *In re Grand Jury Subpoena Served Upon John Doe* made this observation:

If in fact Slotnick accepted benefactor payments, he should have heeded the warning of the Model Code of Professional Responsibility against accepting payment of clients' fees from a third party. DR 5–107(A), EC 5–21, 5–22. Accepting payment of clients' fees from a third party may subject an attorney to undesirable outside influence, *particularly where the attorney is representing clients in criminal matters,* Model Rules of Professional Conduct, Rule 1.7, *and the third party is the head of a criminal enterprise of which the clients are members.* In such a situation, an ethical question arises as to whether the attorney's loyalties are with the client or the payor. *See* Judd, *Conflicts of Interest—A Trial Judge's Notes,* 44 Fordham L.Rev. 1097, 1099–1101, 1105 n. 41 (1976).

781 F.2d 238, 248 n. 6 (emphasis added).

The evidence the government proffers and which is reflected in the excerpted conversations may leave the jury with little doubt about the roles of Shargel, Cutler and Pollok as house counsel, which, in turn, will materially aid in establishing the existence of an enterprise.

The significance of the foregoing for this motion to disqualify counsel speedily becomes apparent when examined in the revealing light of precedent. *United States v. Castellano,* 610 F.Supp. 1151

(S.D.N.Y.1985) is particularly relevant. In that case the government moved to disqualify Shargel from representing Richard Mastrangelo based upon Shargel's receipt of benefactor payments from Roy DeMeo on behalf of members of DeMeo's crew. The court, after a hearing, determined that the government "presented a substantial case for using Shargel's activities and practices as an attorney to help establish the existence of a relationship among several of the defendants suggestive of an organized crime 'enterprise' under the Racketeer Influenced and Corrupt Organizations Act ('RICO')." *Id.* at 1153. The court then went on to note that:

> Shargel concedes that if the government is permitted to present this theory to the jury then "obviously I have no place represent[ing] Mastrangelo." Transcript of Pre–Hearing Conference at 22 (Mar. 1, 1985).

I have examined the transcript of that conference and, in the interest of complete accuracy, that transcript reads as follows, at page 22, lines 5–7:

> Obviously, if the government wants to go to trial with a claim that I am a coconspirator, an agent, obviously I have no place represent (sic) Mr. Mastrangelo. That is clear.

The proof of Shargel's receipt of benefactor payments is considerably stronger in this case than it was in *Castellano*, given the explicit acknowledgement of such payments by Gotti. In *Castellano*, not only did Shargel deny receiving such payments but the court disqualified him based upon the observation that:

> "If the jury believes Witness A, they might conclude that Shargel's activities were probative of the existence of an enterprise in which DeMeo, and other crew leaders treated attorneys' fees as a cost of doing business, and as a means for selecting attorneys who would function with the crew's interest in mind."

*Id.* at 1159. Here, the words of the benefactor speak for themselves.

Reference was previously made to twenty cases in which the attorneys represented persons the government claims are or were associated with these defendants in the Gambino Organized Crime Family. That reference was not gratuitous. I am aware of the observation in *United States v. Simmons,* 923 F.2d 934, 949 (2d Cir.1991) that "the fact that a lawyer has multiple clients in no way implies a connection between them." The court quickly added that: "This observation, however, was made under circumstances in which there was no other evidence of a criminal association between the attorney's clients. We specifically noted that had appellants consulted with an attorney as a *group* rather than as *individuals,* the evidence would have been probative of concerted activity among the several clients."

In his brief in opposition to this motion Shargel inexplicably argues that "No evidence has been presented to this Court that Gerald Shargel, ... made any 'benefactor payments' or engaged in conduct that can be labeled illegal or unethical." (Shargel's Memorandum in Opposition ("Shargel Mem.") at 13). The significance of those payments is derived from their payment by the benefactor (Gotti) on behalf of others, not by Shargel to others. But even as to that, in an excerpt from a conversation between Gotti, Gravano and Locascio on January 4, 1990 Gotti speaks of payments of $5,000 per week to Edwin Schulman, who assisted Shargel and Cutler in their representation of John Carneglia and Michael Coiro, respectively. (Shargel Mem. at 14). As to the receipt of benefactor payments being unethical, *see In re Grand Jury Subpeona served upon John Doe,* 781 F.2d at 248 n. 6, quoted *supra.*

That benefactor payments have indeed been made to Shargel, Cutler and Pollok is a conclusion the jury can readily and justifiably reach. Reference has already been made to the government's representation that Michael Coiro will testify that he paid nothing to Shargel or Cutler for their services to him. Pertinent in this connection is this observation in *Castellano:*

> The jury might also wonder why Shargel performed services for several alleged crew members without compensation, as he testified. They might view his expla-

nation as a device for masking the fact that his principal clients—the crew leaders—paid him enough to cover all his assigned activities.

*Id.* at 1161.

The pernicious effect of benefactor payments upon the "institutional interest in the rendition of just verdicts in criminal cases" and the extent to which they "gravely imperil the prospect of a fair trial" was recognized by Justice Powell in *Wood v. Georgia,* 450 U.S. 261, 268–69, 101 S.Ct. 1097, 1102, 67 L.Ed.2d 220 (1981) in these words:

> Courts and commentators have recognized the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise.

Judge Sofaer captured the essence of the problem in *Castellano:* "Benefactor payments potentially strike at the heart of the attorney-client relationship and thus at the heart of the adversarial process." *United States v. Castellano,* 610 F.Supp. at 1164.

■ I will now address the impact DR 5–102 of the Code of Professional Responsibility on this motion to disqualify counsel. That disciplinary rule provides:

**DR 5–102. Withdrawal as Counsel When the Lawyer Becomes a Witness**

(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).

(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the repre-

sentation until it is apparent that his testimony is or may be prejudicial to this client.

The Code of Professional Responsibility "although lacking the force of legislation, provides guidance on issues of professional conduct." *United States v. Wallert,* 733 F.Supp. 570, 572 (E.D.N.Y.1990) (DR 5–102(B) provided a basis for disqualifying counsel).

Shargel asserts in his Memorandum in Opposition at page 6 that "the prosecutor has 'no present intention' of calling any of the attorneys, who are the subject of this application, as witnesses for the government." Putting aside for the moment the government's Reply Memorandum in Support of its Motion at page 3, n. 3 in which it says "The likelihood that Shargel will be a government witness has increased significantly since our motion was filed." (*Cf.* Gov't Mem. at 64), whether the government will or will not call Shargel or Cutler or Pollok has no significance for this motion. Shargel should surely know, in view of the holding in *Castellano,* that:

> In the light of the government's claims regarding Shargel's involvement, *even if the government were to decline to call Shargel,* he ought to be called as a defense witness to controvert Witness A's testimony about benefactor payments....

*United States v. Castellano,* 610 F.Supp. at 1161.

I wish to make it clear that although the quotations from *Castellano* make reference to Shargel, for purposes of this decision they are deemed to have the same force and effect as to Cutler, Pollok and Shargel.

*United States v. Melo,* 702 F.Supp. 939, 943 (D.Mass.1988) bears resemblance to this case in some respects. In disqualifying counsel, the court said:

> In this case, Weiner's mere presence as counsel at trial may create an appearance of impropriety because the government will no doubt refer to the tape recorded conversations, and introduce Wall's records as evidence of the alleged

conspiracy to provide attorneys' fees and support for members of the organization who face criminal proceedings.

The government does not allege that the attorneys acted improperly. The government does allege, however, that Acquilino Melo was using the attorney to take actions that served the conspiracy—the provision of legal services to co-conspirators who were apprehended and charged.... In these circumstances, if Weiner is identified in the evidence as the attorney referred to in Wall's records and in the tape-recorded conversations, any argument made by Weiner to the jury in this trial concerning the defendants' participation in the alleged scheme to provide attorneys fees to persons within the organization accused of a crime would be problematic in that Weiner would be implicitly arguing as an "unsworn witness" for the propriety of his own conduct as well as explicitly arguing that the government had failed to prove the elements of the crimes charged against his client.

And in *United States v. Castellano, supra,* the court concluded that Shargel's appearance at counsel table would itself engender a distortion of the factfinding process. *Id.* at 1167. So too would the appearance at counsel table of Cutler and Pollok. *See also United States v. Wallert, supra,* at 573 ("In any event, almost inevitably Wall would be considered an unsworn witness.").

Cutler, Shargel and Pollok assure the court in their respective memoranda that their clients will waive any conflicts of interest or other infirmities which may afflict their lawyers. Reference has already been made to the teaching of *Wheat* that a flat rule that waiver can cure any problem of representation cannot be deduced from the Sixth Amendment presumption in favor of counsel of choice. *United States v. Wheat,* 486 U.S. at 160, 108 S.Ct. at 1697. Moreover, "waiver would hardly ensure that the trial could be 'conducted within the ethical standards of the profession' and 'appear fair to all who observe them.'" *United States v. Wallert,* 733 F.Supp. at

574; *accord United States v. Melo,* 702 F.Supp. at 943.

### B. *Defense Attorneys' Representation of Government Witnesses*

The disqualification of Cutler, Shargel and Pollok is also dictated by the fact that their continued participation is instinct with a conflict of interest. Shargel and Cutler previously represented Michael Coiro and Pollok previously represented Anthony Gurino. Coiro and Gurino will be government witnesses at trial.

The issue thus presented was before the Court in *United States v. Iorizzo,* 786 F.2d 52 (2d Cir.1986). In that case, one Tietz testified under oath at a hearing before the State Tax Commission. He was represented by a lawyer paid for by Iorizzo and who thereafter represented Iorizzo at the trial which is the subject of this appeal. The government's key witness at that trial was Tietz. Following his conviction, Iorizzo argued on appeal that he did not have the assistance of conflict-free counsel. The court agreed and reversed his conviction.

> In attempting to represent Iorizzo in this matter, trial counsel was confronted with an unavoidable conflict of interest.... Because Tietz's prior statements had been made at a time when defense counsel was representing him, the prior testimony could not be used to attack Tietz's credibility without putting defense counsel's role before the State Tax Commission in issue. Any such attempt would open the way for Tietz to be asked on redirect about his legal representation at the State Tax Commission hearing and about any advice he had received from defense counsel at that time.... Finally, whether or not he [trial counsel] actually testified, *his firsthand involvement in Tietz's testimony would cause any argument to the jury about that testimony to be as a statement of a witness as well as of an advocate. Our prior decisions indicate that such circumstances constitute a disqualifying conflict under Disciplinary Rule 5-102(A).*

*United States v. McKeon,* 738 F.2d 26, 34–35 (2d Cir.1984).

*Id.* at 57 (emphasis added).

It is particularly significant to take note of the Court's unequivocal position in this regard as expressed in *McKeon,* 738 F.2d at 35:

> Although we have adopted a "restrained approach" with respect to disqualification of counsel ... disqualification *will* occur where the presence of counsel will taint the trial.... *Such a taint occurs where counsel assumes a role as an unsworn witness whose credibility is in issue.*

(Emphasis added and citations omitted).

■ The presumption of a right to counsel of choice is yet again overcome by a clear "demonstration of actual conflict" or at the very least, by a clear demonstration "of a serious potential for conflict." *United States v. Wheat,* 486 U.S. at 164, 108 S.Ct. at 1700.

■ The defendants Gotti, Gravano and Gambino rely upon *United States v. Cunningham,* 672 F.2d 1064 (2d Cir.1982) as authority for denying the government's motion to disqualify their attorneys Cutler, Shargel and Pollok. In *Cunningham,* the government moved to disqualify Michael Tigar, Esq. from representing the defendant Cunningham based upon Tigar's prior representation of John Spain whom the government proposed to call as a witness at Cunningham's trial. Tigar stated that "his meetings with Spain were limited in number, duration and scope, and he represented that he had learned no facts from Spain that Spain had not thereafter revealed on the record during his trial. Tigar represented that he would not exploit any information as to which Spain had a valid and existing attorney-client privilege." *Id.* at 1068. Spain was not represented by Tigar at his trial for perjury. The relationship between Tigar and Cunningham extended over a period of six years during which Tigar had successfully defended Cunningham on five occasions and was thoroughly familiar with the details of the government's case against Cunningham. The court reversed the district court's or-der of disqualification holding that, balancing Cunningham's right to counsel of his choice against the government's interest in disqualifying Tigar, disqualification was not warranted. The disqualification of Tigar in *Cunningham* is readily distinguishable. Given the limited relationship which Tigar said he had with Spain, the court concluded that "[t]he government's interest in disqualifying Tigar ... is relatively weak." *Id.* at 1071. That is clearly not the case here. The relationship between Coiro and Shargel and Cutler is considerably more extensive and the government's interest in disqualifying them is quite strong. And although there is a similarity between that case and this one regarding the nature and duration of the attorney-client relationships between Tigar and Cunningham and Gotti and Cutler and Gravano and Shargel, *Cunningham* cannot be read to decide that the duration of a lawyer's relationship with his client gives him a prescriptive right to ignore the Canons of Professional Responsibility or give him a prescriptive right to subvert the institutional interest in fair trials and just verdicts. *See United States v. Arrington,* 867 F.2d 122, 128 (2d Cir.1989) ("Moreover, conditioning the admissibility of a statement by counsel on the defendant's interest in retaining counsel would produce the anomalous result of admitting statements made by a co-conspirator who had recently become defendant's counsel, but not admitting the statements if the co-conspirator had long been defendant's counsel.").

The *Cunningham* case is far more relevant to this one insofar as it addresses the disqualification of Kennedy, the defense attorney for Sweeney, who was Cunningham's partner. Sweeney and Cunningham were charged with conspiracy to obstruct the perjury trial of Spain by fabricating and then destroying evidence. Ms. McCreery, a receptionist in their office, was expected to testify for the government to a conversation she had had with Kennedy in which Kennedy's statements could be construed to support the charges against Cunningham and Sweeney. It was thus clear that Kennedy *ought* to be a rebutting

witness to deny the conversation or to furnish an innocent explanation. The court concluded that Kennedy could offer neither the denial nor an explanation

> [w]ithout implicitly testifying as an unsworn witness. Since as an unsworn witness, he would not be subject to cross-examination or explicit impeachment, the interest sought to be protected by the Disciplinary Rules would be even more seriously eroded than if Kennedy appeared as a sworn witness. We therefore conclude, in balancing Sweeney's interest in retaining counsel of his own choice against that of the government in disqualifying Kennedy as trial counsel, that the disqualification of Kennedy must stand—assuming that McCreery's testimony is admissible.

*Id.* at 1075.

The recorded conversations in which it was suggested by Shargel, Cutler and Rosen that Thomas Gambino plead guilty to avoid the necessity of Gotti and others risking contempt by refusing to testify pursuant to a trial subpoena would be admissible on Count Twelve of the superseding indictment, charging Gotti with obstructing justice in the Gambino trial. The analogy between the Kennedy–McCreery conversation and those in this case is complete and requires the same result.

It is also important to note that *Cunningham* was decided six years prior to *Wheat* and its continued viability is questionable. In *United States ex rel. Stewart v. Kelly*, 870 F.2d 854 (2d Cir.1989), the defendant claimed a denial of his Sixth Amendment right to counsel by the disqualification of counsel of his choice when it became known that he previously represented a key prosecution witness. The defendant desired to be represented by that attorney notwithstanding the conflict of interest. On appeal, the defendant placed principal reliance upon *Cunningham.* The court held that the trial judge has broad discretion in balancing the competing interest of the right to counsel and the right to a fair trial. In addressing the defendant's right to waive that conflict, a right which was recognized in *Cunningham*, the court

said that it is not clear that *"Cunningham* retains any force in light of the subsequent holding in *Wheat. Cf. Arrington,* 867 F.2d at 128–29 (affirming district court's disqualification of defendant's attorney despite defendant's consent to representation.)" *Id.* at 857. *See also United States v. Reeves,* 892 F.2d 1223, 1227 (5th Cir. 1990); *United States v. O'Malley,* 786 F.2d 786 (7th Cir.1986); *United States v. Defazio,* 899 F.2d 626 (7th Cir.1990); *United States v. Falzone,* 766 F.Supp. 1265 (W.D.N.Y.1991).

The disqualification of Shargel and Cutler is also required because of their participation in the events underlying the obstruction of justice count discussed above. It is difficult to comprehend how Shargel and Cutler could present a defense against this charge without becoming unsworn witnesses.

### C. The Receipt of Income by Gotti and the Attorneys

■ Set out above were excerpts in which Gotti is heard to say that he gave the lawyers $300,000 in one year and that they were taking money under the table. That statement is relevant and admissible in the government's case on Count Thirteen of the superseding indictment, conspiracy to defraud the United States in relation to the collection of taxes. Those statements require disqualification for two reasons. First, Shargel contends that Gotti's statement is merely theoretical or speculative. (Shargel Mem. at 35.) Cutler contends the statement to be of "dubious reliability." (Cutler Mem. at 7.) Those are arguments which they cannot make to a jury without becoming unsworn witnesses who implicitly testify to their version of the statement. *See United States v. Cunningham,* 672 F.2d at 1074. Disqualification is also required because a jury might well conclude from those statements that the lawyers aided and abetted Gotti's tax fraud by not reporting the moneys he pays them. The clear implication that they, too, were committing crimes—"Every time you take a client, another one of us on, you're breaking the law"—gives rise to the type of conflict of interest recognized in *United*

*States v. Cancilla,* 725 F.2d 867 (2d Cir. 1984), or at the very least, gives rise to a serious potential for conflict which justifies disqualification. *Wheat v. United States,* 486 U.S. at 164, 108 S.Ct. at 1699.

I have balanced the defendants' Sixth Amendment right to counsel of their choice against the grave peril the continued representation by those counsel poses to the integrity of the trial process. Having done so, I am driven to conclude that the scales weigh heavily in favor of the integrity of the trial process.

I shall not discuss the many other grounds which virtually mandate disqualification for which the government has made a substantial showing in its Memorandum and Reply Memorandum. Those that I have discussed I believe to be sufficient to compel that result.

I have considered the possibilities of less drastic alternatives and have concluded that there are none that are viable. The extensive redactions which the defendants propose would not only emasculate the intercepted conversations but would deprive the government of its right to present its case as it deems best as well as deprive it of the right to present evidence which is relevant and admissible. The conflicts of interest and other grounds for disqualification are, in my view, so egregious that waivers cannot be accepted without seriously and adversely affecting the independent interest of the federal courts in ensuring that "criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160, 108 S.Ct. at 1697.

In arriving at my decision to disqualify counsel, I was mindful of the concern expressed by Justice Marshall in his dissent in *Wheat* "that a trial court may not reject a defendant's chosen counsel on the ground of a *potential* conflict of interest absent a showing that both the likelihood and the dimensions of the feared conflict are substantial." *Id.* at 166, 108 S.Ct. at 1700–01 (emphasis added). He also expressed the view that the "trial court that rejects a criminal defendant's chosen counsel on the

ground of a *potential* conflict should make findings...." *Id.* at 168, 108 S.Ct. at 1701 (emphasis added). Although his concerns are addressed to *potential* conflicts, I have endeavored to address them notwithstanding my firm belief that the conflicts here are actual and not potential. I am satisfied that the government has made a substantial showing which is reflected in my findings.

■ On page 2 of his Memorandum of Law, Pollok indicates that he will not deliver an opening statement, cross-examine witnesses, present evidence on behalf of the defense, nor will he sum up, and therefore asserts his right to continue as counsel. He further contends that his limited role as counsel to Gambino does not require his presence at counsel table nor does it require that he be introduced to the jury. He may, therefore, "participate in all aspects of the defense except the actual trial" and "may ... be present in the courtroom so long as he does not appear as counsel and is not situated at the counsel table." *United States v. Cunningham,* 672 F.2d at 1074.

■ Intercepted conversations to which reference has previously been made indicate that Michael Rosen was a party to the plan that Gambino plead guilty, which is the basis for the obstruction of justice charge in Count Twelve and Racketeering Act Thirteen of the superseding indictment. Because Gambino is not named in either, Rosen need not become an unsworn witness by addressing the jury or by cross-examining witnesses with respect to the events surrounding the formulation and discussion of that plan. His exclusion from the trial is, therefore, not required on condition that he abides by this limitation.

Many of the issues raised by this motion were thoroughly considered and eloquently discussed by Judge Sofaer in *United States v. Castellano,* 610 F.Supp. 1151, 1166–67 (S.D.N.Y.1985). His observations are peculiarly appropriate here and bear repeating:

Whatever the reality of [the attorney's] practice ... his conduct makes clear that

his disqualification will not deter appropriate attorney behavior. The evidence presented ... creates an appearance that enables the government to argue that he is an attorney who serves and has an intimate connection with a criminal enterprise. This appearance of impropriety reflects conduct that should be discouraged, both because it is inherently unethical and because it poses a significant danger to defendants at a trial in which one of the contested issues will be the existence of a criminal enterprise.... Permitting attorneys to act ..., by precluding the government from calling them as witnesses or presenting evidence about their actions, would ill serve the goals of ethical and effective representation, as well [as those] of the full and fair enforcement of substantive criminal law.

Counsel, in opposition to this motion and with a singular voice, express the fear that disqualification will have a chilling effect on vigorous advocacy and that criminal defendants will be at the mercy of the prosecutor as regards their right to counsel of choice. I am neither persuaded nor impressed by their "forensic forebodings of indeterminate future disaster," confident in the conviction that judges will, when required, safeguard that precious right. I am equally confident that judges will not be deterred from discharging their responsibility to ensure that "criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." It is in the discharge of that responsibility that I grant the government's motion. The defendants will appear before me at 9:30 A.M. on August 7, 1991 with new trial counsel and for such other purposes as may be required.

SO ORDERED.