UNITED STATES of America, Plaintiff,

v.

Richard S. CANNISTRARO and Richard O. Bertoli, Defendants.

Crim. A. No. 89–218.

United States District Court,
D. New Jersey.

May 12, 1992.

John M. Fietkiewicz, David M. Rosenfield, Asst. U.S. Attys., U.S. Attorney's Office, Newark, N.J., for U.S.

Richard O. Bertoli, pro se.

Franklin M. Sachs, Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello, Newark, N.J., for defendant Richard O. Bertoli.

Michael B. Pollack, New York City, for defendant Richard S. Cannistraro.

John J. Barry, Clapp & Eisenberg, Newark, N.J., for Michael B. Pollack.

## OPINION

LECHNER, District Judge.

This is a criminal action which originated on 16 June 1989 when an indictment (the "Indictment") was returned. Defendants Richard O. Bertoli ("Bertoli"), Leo M. Eisenberg ("Eisenberg") and Richard S. Cannistraro ("Cannistraro") (collectively the "Defendants") were named in the Indictment.[1] On 29 September 1989 a six count superseding indictment (the "Superseding Indictment")[2] was returned against the Defendants.[3] On 21 January 1992 the Government returned an eight count second superseding indictment (the "Second Superseding Indictment") against Bertoli and Cannistraro. Count One of the Second Superseding Indictment charges Bertoli and Cannistraro with racketeering activities in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961, *et seq.* Count Two charges Bertoli and Cannistraro with conspiracy to commit racketeering in violation of RICO. Count Three charges Bertoli and Cannistraro with conspiracy to obstruct justice. Counts Four through Seven charge Bertoli with obstruction of justice in violation of 18 U.S.C. § 1503. Count Eight charges Bertoli and Cannistraro with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371.[4] Eisenberg is not a defendant in the Second Superseding Indictment although he is listed as a co-conspirator.[5]

Currently before the court is the motion of the Government to disqualify Michael B. Pollack, Esq. ("Pollack"), counsel to Cannistraro, (the "Motion to Disqualify") on the grounds that Pollack may be a potential witness at trial, Pollack previously represented a potential witness at trial and Pollack is the target of an unrelated grand jury investigation.[6] For the reasons set

---

1. On 16 June 1989 the Indictment was sealed by order of United States Magistrate Judge Stanley R. Chesler.

2. On 29 September 1989 the Superseding Indictment was sealed by Magistrate Judge Chesler and was unsealed on 5 October 1989.

3. The nature of the counts in the Superseding Indictment and the facts underlying it are set forth in the various opinions preceding this one. *See, e.g., United States v. Eisenberg,* 773 F.Supp. 662, 672–80 (D.N.J.1991).

4. Previously, Bertoli moved to dismiss Counts One, Two and Three of the Superseding Indictment which are substantially the same as Counts One, Two and Three of the Second Superseding Indictment. Bertoli also made several pretrial omnibus discovery motions, all of which were discussed in *Eisenberg,* 773 F.Supp. at 662.

5. Eisenberg entered a plea to count one of the Superseding Indictment on 23 January 1992.

6. The following has been submitted in connection with the Motion to Disqualify: Memorandum of Law in Support of the Government's Motion to Disqualify Michael B. Pollack, Esq. (the "Moving Brief"); Exhibits to Memorandum of Law in Support of the Government's Motion to Disqualify Michael B. Pollack, Esq. (the "Government's Ex."); Memorandum of Law in Opposition to the Government's Motion to Disqualify Michael B. Pollack (the "Opp.Brief"); Reply Memorandum of Law in Support of the

forth below, the Motion to Disqualify is granted.

*Facts*

On 6 November 1989 Cannistraro was arraigned under the initial indictment in this matter. At the arraignment, Patricia Cody, Esq., Assistant Federal Public Defender, appeared as standby counsel to Cannistraro who was then proceeding pro se. Minutes of Proceedings, dated 6 November 1989. On 25 January 1990 Pollack, on behalf of Cannistraro, filed a motion on short notice. Notice of Motion, filed 25 January 1990. Since that time, Pollack has continued to represent Cannistraro to date.

The factual basis upon which the Government relies for the Motion to Disqualify comes in large part from the evidence obtained from the Cayman Islands and from a proffer of testimony made by Joseph Lugo ("Lugo"), an individual who has been associated with Bertoli since the early 1970s and who has most recently worked with Bertoli in the offices of International 800 in Nanuet, New York. Government's Ex. 2, Affidavit of Michael J. Cahill, dated 24 February 1992 (the "1st Cahill Aff."), ¶ 2(c). The Government asserts that Pollack has knowledge of facts relating to the proceeds of the RICO and securities fraud charged in the Second Superseding Indictment because of the following events.

The Government states Bertoli, Cannistraro and Eisenberg deposited in Cayman Islands banks millions of dollars in proceeds obtained through fraudulent trading of securities of Astrosystems, Inc., Nature's Bounty, Inc., Liquidation Control, Inc., Toxic Waste Containment, Inc., High Technology Capital Corp. and Solar Age Manufacturing Corp. 1st Cahill Aff., ¶ 4. The Government states in 1984 Bertoli hired Sidney Coleman ("Coleman") of Paget–Brown & Co. Ltd. ("Paget–Brown") to administer and manage this money. *Id.* It contends that in 1987 or 1988 Coleman formed three individual corporations: Beecham Enterprises Corp. ("Beecham") which was owned by Bertoli; Centurion Enterprises Corp. ("Centurion") which was owned by Cannistraro and Eastern Funds Corp. ("Eastern") which was owned by Eisenberg. *Id.* Subsequently, Coleman opened bank accounts for Beecham, Centurion and Eastern at Morgan Grenfell (Cayman) Ltd. ("Morgan Grenfell") in the Cayman Islands, which accounts had in total over eight million dollars. *Id.*

The Government states Lugo has proffered the following information regarding the management and transfer of eight million dollars from the Cayman Islands to Andorra. Lugo stated during 1989 he worked daily with Bertoli in New York and that Bertoli asked him to assist in the transfer of the money from the Cayman Islands to Andorra. *Id.*, ¶ 5. Lugo stated Bertoli indicated he was having trouble with Coleman because Coleman would not transfer monies to pay for Cannistraro's legal fees in this case. *Id.*, ¶ 7. Lugo stated Bertoli subsequently replaced Coleman with Ernest Foster ("Foster"), a money manager at Business Services International, Ltd. in the Cayman Islands. *Id.*

Lugo proffered that in November 1989 he attended a breakfast meeting with Bertoli and Foster in New York at which Bertoli stated he wanted Foster to transfer the money to Andorra. *Id.*, ¶ 9. Lugo stated at this meeting Bertoli directed Lugo to obtain Eisenberg's signature on a release which would cause the money to be transferred. *Id.*, ¶ 10. Lugo also submitted Bertoli signed Richard Cannistraro's name on a document in Lugo's presence and told Lugo the signature needed to be witnessed.[7] *Id.* Lugo stated Bertoli told him

---

Government's Motion to Disqualify Michael B. Pollack, Esq. (the "Reply Brief").

Oral argument was heard on 1 May 1992. References to the arguments made will be cited as "Oral Arg.Tr. at ___". On 4 May 1992 chambers received a letter from Cannistraro.

**7.** This document has been identified as an indemnity agreement (the "Indemnity Agreement"), dated 21 February 1987, between Can-

nistraro, Centurion and Paget–Brown. Government's Ex. 4. The date is on the first page of the Indemnity Agreement; however, the signature page is not dated.

The Indemnity Agreement was produced by Paget–Brown in response to the Cayman Islands discovery request. Moving Brief at 3–4. The Indemnity Agreement permitted Paget–Brown to accept instructions, in its discretion, of Can-

to sign any name in the telephone book as a witness; however, Lugo instead took the document to Pollack who signed as the witness of Cannistraro's signature. *Id.*

Lugo stated that when Pollack learned the document he had signed as a witness was sent to the Cayman Islands to be used for the transfer of funds, Pollack told Bertoli that the document was dangerous. Government's Ex. 3, Affidavit of Michael Cahill, dated 23 March 1992 (the "2d Cahill Aff."), ¶ 4. Lugo stated Bertoli told Pollack not to worry because there would probably be a fire and Pollack said good. *Id.*

The Government states that in December 1989 an account was set up in the name of Fosca at the Bank Agricoli Comerical D'Andorra in Andorra. 1st Cahill Aff., ¶ 15. The Government further states that in February and April 1990 Morgan Grenfell transferred the balance of the Centurion, Beecham and Eastern accounts to the Fosca account. *Id.*, ¶ 18. Lugo stated after the money was in the Fosca account, Bertoli instructed Jose Camprubi ("Camprubi"), the man hired to manage the Fosca account, to wire transfer between $400,000 and $750,000 from Fosca to a Swiss bank account. 2d Cahill Aff., ¶ 5. Lugo stated Bertoli advised him that the money was to pay Pollack for legal fees incurred in representing Cannistraro. *Id.* Lugo stated in April or May 1990 he attended a meeting with Bertoli and Pollack in New York during which Bertoli informed Pollack that the money had been wired to the Swiss bank account. *Id.*

The Government states it has also received evidence that Pollack and Foster were in Andorra in November 1991. *Id.*, ¶ 6. This evidence was obtained from Foster in February 1992 when he was arrested by the Federal Bureau of Investigations (the "FBI") in Florida on money laundering charges. *Id.* The Government states when Foster was arrested he was in possession of two bills, dated 7 November 1991, from the Andorra Park Hotel, one of

which was made out to Pollack. *Id.* In addition, Foster had Pollack's credit card invoices and Pollack's name and work, home and vacation addresses and telephone numbers on the minicomputer Foster had with him at the time of his arrest. *Id.*, ¶¶ 6–7.

*Pollack's Prior Representation of Potential Witnesses*

Prior to the indictment of Cannistraro, Pollack represented Lugo in his bankruptcy proceedings in the United States District Court for the Southern District of New York. Moving Brief at 6. Pollack also represented Lugo in a criminal investigation of stock manipulation charges brought by the Manhattan District Attorney's office. *Id.* Lugo stated he provided Pollack with privileged information during his representation of the criminal investigation. 2d Cahill Aff., ¶ 8. Lugo indicated if he is a witness at trial, he will invoke the attorney-client privilege with respect to any communications made to Pollack. *Id.*

Pollack is currently representing Steven Cloyes ("Cloyes") in the related civil action, *SEC v. Monarch Funding Corp.*, No. 85–7072 (S.D.N.Y.), now pending in the Southern District of New York. Moving Brief at 6 n. 2. Cloyes is another potential witness of the Government who has not decided whether he will waive the attorney-client privilege if Pollack cross-examines him at trial in this matter. *Id.*

*Grand Jury Investigation*

On 21 January 1992 Pollack received a letter informing him he was the target of a grand jury investigation with respect to a conspiracy to file a false income tax return. Moving Brief at 6. This grand jury investigation is unrelated to the facts underlying the Second Superseding Indictment. *Id.*

*Discussion*

The Government argues Pollack's potential conflicts of interest warrant disqualification. Moving Brief at 7. Specifically, the Government argues Pollack is a potential witness in this case because he has

---

nistraro or of designated persons giving instructions on Cannistraro's behalf. Government's Ex. 4, ¶ 2. The Government alleges the Indem-

nity Agreement was critical for the transfer of funds from the Cayman Islands to Andorra. Reply Brief at 6 n. 3.

knowledge of events underlying charges in the Second Superseding Indictment. *Id.* at 9–14; Reply Brief at 5–11. Specifically, the Government states Pollack has knowledge of the witnessing of Cannistraro's signature on the Indemnity Agreement, the use of the Indemnity Agreement for the transfer of Centurion funds and the continuing nature of the racketeering activity. *Id.* at 5–6.

In addition, the Government argues if Lugo is a witness for the Government, Pollack would have a conflict of interest and could not effectively cross-examine Lugo. Moving Brief at 14–17; Reply Brief at 15–17. The Government also argues because Pollack is the subject of a grand jury investigation, Pollack may seek to curry favor with the Government which could possibly result in an ineffective assistance of counsel claim, Moving Brief at 18–20; Reply Brief at 18–21, and, at the least, raises the appearance of impropriety.

Pollack argues if he is called as a witness it would be in Bertoli's case, not Cannistraro's. Opp.Brief at 5–19. Pollack further argues the Government has not definitely stated it intends to call Lugo as a witness. *Id.* at 20; Oral Arg.Tr. at 7. Pollack further argues his representation of Lugo involved a completely unrelated matter and even if there were a conflict of interest another counsel could cross-examine Lugo. Opp.Brief at 20–29. Pollack states that the Government has made a plea offer to Cannistraro; therefore, even assuming Pollack sought to curry favor with the Government, it would not be inconsistent with the Government's desires. *Id.* at 29–30. Pollack argues severance of the trial and Cannistraro's waiver of any conflict of interest are viable alternatives to disqualification. *Id.* at 31–33.

### A. Disqualification of Counsel

"The Sixth Amendment to the Constitution guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.'" *Wheat v. United States,* 486 U.S. 153, 158, 108 S.Ct. 1692, 1696–97, 100 L.Ed.2d 140 (1988), *reh'g denied,* 487 U.S. 1243, 108 S.Ct. 2918, 101 L.Ed.2d 949. The Sixth Amendment right to counsel "was designed to assure fairness in the adversary criminal process." *Id.* (citing *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 667–68, 66 L.Ed.2d 564 (1981)); *Government of Virgin Islands v. Zepp,* 748 F.2d 125, 131 (3d Cir.1984) (quoting *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984)). The focus of Sixth Amendment claims, therefore, is on the "adversarial process, not on the accused's relationship with his lawyer as such." *United States v. Cronic,* 466 U.S. 648, 657 n. 21, 104 S.Ct. 2039, 2046 n. 21, 80 L.Ed.2d 657 (1984); *accord Wheat,* 486 U.S. at 159, 108 S.Ct. at 1697.

The Sixth Amendment right to effective assistance of counsel has been construed to include the right to secure counsel of choice. *Powell v. Alabama,* 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932); *see also Caplin & Drysdale v. United States,* 491 U.S. 617, 624, 109 S.Ct. 2646, 2651–52, 105 L.Ed.2d 528 (1989). The right to counsel of choice is founded in the right of a criminal defendant to control the conduct of his defense because "it is he who suffers the consequences if the defense fails." *Faretta v. California,* 422 U.S. 806, 820, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). Although there is a presumptive right to counsel of choice, it is not an absolute right. *Wheat,* 486 U.S. at 164, 108 S.Ct. at 1699–00; *Morris v. Slappy,* 461 U.S. 1, 13–14, 103 S.Ct. 1610, 1617–18, 75 L.Ed.2d 610 (1983). As observed by the Supreme Court:

> [W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

*Wheat,* 486 U.S. at 159, 108 S.Ct. at 1697 (citing *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Morris,* 461 U.S. at 13–14, 103 S.Ct. at 1617–18).

The Court recognized that conflict of interest is one situation which may rebut the presumption of a defendant's counsel of choice. *Wheat*, 486 U.S. at 159–60, 108 S.Ct. at 1697–98; *see also Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981); *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Holloway v. Arkansas*, 435 U.S. 475, 481, 98 S.Ct. 1173, 1177, 55 L.Ed.2d 426 (1978). The *Wheat* Court observed although a defendant may waive his or her counsel's conflict of interest, such waiver does not necessarily cure the problems indicative to conflicts of interest. 486 U.S. at 160, 108 S.Ct. at 1697–98.

The *Wheat* court explained the dilemma facing a trial court confronted with a potential conflict of interest. "[T]rial courts confronted with multiple representations face the prospect of being 'whipsawed' by assertions of error no matter which way they rule." *Id.* at 161, 108 S.Ct. at 1698. Where multiple representations are allowed, advocacy of counsel is impaired and the defendant may assert a claim for ineffective assistance of counsel regardless of whether the defendant waived his or her right to conflict-free representation. *Id.* at 161–62, 108 S.Ct. at 1698–99. If multiple representation is prohibited, the defendant may raise a Sixth Amendment violation. *Id.* at 161, 108 S.Ct. at 1698. The independent interest of the trial court "in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them," *id.* at 160, 108 S.Ct. at 1698, the "institutional interest in the rendition of just verdicts in criminal cases," *id.*, as well as the "interest of a criminal defendant," *id.*, require flexibility in the trial court to decline a proffer of waiver if it justifiably finds an actual or potential conflict. *Id.* at 162–63, 108 S.Ct. at 1698–99.

The Court explained the driving force behind the latitude given to the trial court in accepting a waiver as follows:

Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. *It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial for what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants.* These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics. *Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.*

*Id.* at 162–63, 108 S.Ct. at 1699 (emphasis added).

The Court stated, therefore, "the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but *in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict....*" *Id.* at 163, 108 S.Ct. at 1699 (emphasis added). The determination of whether disqualification is warranted is "left ... to the informed judgment of the trial court," which can evaluate the facts and circumstances of the case. *Id.* at 164, 108 S.Ct. at 1700.

The Third Circuit has declined to accept waivers of conflicts of interest be they actual or potential. *See, e.g., United States v. Moscony*, 927 F.2d 742 (3d Cir. 1991), *cert. denied*, — U.S. ——, 111 S.Ct. 2812, 115 L.Ed.2d 984 (1991); *Zepp*, 748 F.2d at 125; *United States v. Flanagan*,

679 F.2d 1072 (3d Cir.1982), *rev'd on other grounds,* 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984); *United States v. Dolan,* 570 F.2d 1177 (3d Cir.1978).

In *Moscony,* defendants Moscony and Cullen and various employees were all represented by one law firm during the grand jury investigations. 927 F.2d at 747. After the grand jury indicted Moscony and Cullen,[8] the Government realized the employees were expected to be called as witnesses in the trial of Moscony. *Id.* The Government, therefore, moved to have the law firm disqualified because it had represented the employees during the grand jury investigations and the employees had made confidential statements to the law firm. *Id.*

After a hearing on the issue of disqualification, the court concluded the employees' "testimony ... would be central to the government's case, and that vigorous cross-examination of these witnesses would be necessary." *Id.* at 747–48. The trial court disqualified the law firm because to forego cross-examination would deprive Moscony of his Sixth Amendment rights and to pursue cross-examination would have violated ethical standards of privileged communications. *Id.* at 748.

On appeal, the Circuit affirmed and observed: "Conflicts of interest arise whenever an attorney's loyalties are divided, and an attorney who cross-examines former clients inherently encounters divided loyalties...." 927 F.2d at 750 (citations omitted). The court stated that because the witnesses could not be cross-examined or impeached without the defense attorney revealing information previously imparted in confidence, there was an actual conflict of interest justifying disqualification. *Id.* at 750–51.

In *Flanagan,* the trial court conducted a hearing pursuant to Fed.R.Crim.P. 44(c) to determine if four criminal defendants who were all represented by the same law firm were aware of the risks of joint representation and their right to separate representation. 679 F.2d at 1073. Although the defendants voluntarily and intelligently waived any claim of conflict of interest, the court disqualified the law firm because it found a conflict of interest was very likely to arise during the course of the proceedings. *Id.* The Circuit affirmed the disqualification and stated: "The *potential* for conflict arising from the firm's receipt of confidential information from all the defendants, and its obligations in defending just one of the defendants, perhaps at the expense of the others, is obvious." *Id.* at 1076 (emphasis added).

In *Dolan,* the court had to determine whether the defense counsel's joint representation of co-defendants Dolan and Garofolo would give rise to a conflict of interest and whether the trial court erred in rejecting the co-defendants' waiver of such conflict. 570 F.2d at 1179. Prior to trial Garofolo entered a plea of guilty. *Id.* After questioning by the court, Dolan's counsel indicated he did not believe there would be a conflict of interest unless Garofolo testified and inculpated Dolan. The trial court declared a mistrial and ordered counsel to withdraw from representing either Dolan or Garofolo who had been subpoenaed to be a rebuttal witness. *Id.* at 1179–80.

The Circuit affirmed the trial court's order disqualifying the defense counsel and stated:

> [W]hen a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform with the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems implicating the defendant's comprehension of the waiver. *Under such circumstances, the court can elect to exercise its supervisory authority over members*

---

8. Cullen subsequently pleaded guilty. *Moscony,* 927 F.2d at 747.

*of the bar to enforce the ethical standard requiring an attorney to decline multiple representation.*

*Id.* at 1184 (as quoted with approval in *Wheat* 486 U.S. at 162, 108 S.Ct. at 1699) (emphasis added and footnote omitted).

Other courts have similarly followed the precepts of *Wheat* and disqualified counsel despite the existence of merely a potential conflict. *See, e.g., United States v. Jacobs,* Cr. No. 91–484, 1992 U.S. Dist. LEXIS 530 (S.D.N.Y. 22 Jan. 1992) (strong possibility that either defendant or Government would be prejudiced by defense counsel's presence as attorney and unsworn witness justifies disqualification); *United States v. Gotti,* 771 F.Supp. 552 (E.D.N.Y.1991) (waiver would not ensure trial could be conducted in manner to appear fair to jury); *United States v. Melo,* 702 F.Supp. 939, 943–44 (D.Mass.1988) (defense counsel's mere presence at trial counsel may create appearance of impropriety because Government will introduce tape concerning defense counsel's participation in alleged conspiracy).

In *Gotti,* the court was faced with the issue of whether to disqualify Messrs. Cutler, Pollok and Shargel on the grounds that there was evidence they had been house counsel to the charged racketeering enterprise, had previously represented a Government witness and had allegedly taken money under the table for their services. 771 F.Supp. at 560–66. The defendant argued the motion to disqualify should be denied because there was no present intention of the prosecutor to call any of the attorneys as Government witnesses. *Id.* at 562. The court rejected this argument holding that even if they were not called as Government witnesses, the attorneys may be called as defense witnesses to controvert testimony about benefactor payments. *Id.*

The *Gotti* court further stated disqualification was necessary because of the partic-ipation of Shargel and Cutler in events underlying the obstruction of justice count. *Id.* at 565. The court stated it would be impossible for them to present a defense to this charge without becoming unsworn witnesses. *Id.* Lastly, the court stated disqualification is required because a jury might conclude from the statements regarding receipt of money that the lawyers aided and abetted Gotti's tax fraud. *Id.*

### 1. Potential Witness at Trial

 In this case, the Government argues because Pollack has knowledge of or participated in actions which underlie some of the charges of the Second Superseding Indictment, he is a potential witness in the trial. Moving Brief at 9; Reply Brief at 5–6. The Government contends Pollack could be called as a witness by either Cannistraro, Bertoli or it.

Specifically, the Government states Pollack could be called as a witness by Cannistraro to defeat allegations that Cannistraro signed the Indemnity Agreement. Moving Brief at 9; Reply Brief at 9. The Government argues that Cannistraro may seek to deny any involvement with Centurion or any of the Cayman Islands entities. Moving Brief at 9–10. The Government submits that testimony by Pollack, that he did not actually witness Cannistraro's signature, could corroborate such a claim by Cannistraro. *Id.* at 10.

The Government states it could call Pollack as a witness to establish Bertoli's control over Centurion and the other Cayman Islands accounts or the obstruction of justice charges against Bertoli.[9] *Id.* at 9–10; Reply Brief at 9. The Government proffers that if Pollack were to testify that he received funds from the Fosca account, such evidence would help establish Bertoli's control over the racketeering proceeds. *Id.*

---

9. Pollack opposes the Government's argument that it may call Pollack as a witness because "[c]ommon sense and experience ... suggest that the likelihood that the government would call Mr. Pollack 'cold' as a prosecution witness is remote, to say the least." Opp.Brief at 13. The Government indicates, however, that absent a proffer by Pollack to the court of his testimony, it would attempt to interview Pollack prior to calling him as a witness. Reply Brief at 9–10. At oral argument, counsel to Pollack represented Pollack would not engage in an interview with the Government. Oral Arg.Tr. at 12.

The Government also argues that Bertoli may call Pollack as a witness if Pollack were to dispute Lugo's statements.[10] Moving Brief at 11. The Government submits that depending on the testimony of Pollack, Bertoli may call Pollack to discredit Lugo's statements. Reply Brief at 10.

Pollack argues he has no knowledge of the facts underlying the Government's case against Cannistraro. Opp.Brief at 7; Oral Arg.Tr. at 4. The Second Superseding Indictment charges Cannistraro with RICO violations, conspiracy to violate RICO, conspiracy to obstruct justice and conspiracy to conduct securities fraud. The Government states that it intends to introduce the Indemnity Agreement to establish that the funds of Centurion, the company allegedly owned by Cannistraro, were transferred from the Cayman Islands to Andorra. Reply Brief at 6. The Government states that such evidence will establish the continuing nature of the racketeering activities. *Id.* at 7–8. As stated, both Cannistraro and Bertoli are charged with violations of RICO. Accordingly, Pollack's testimony regarding the transactions surrounding the transfer of funds may be relevant to the Government's case against Cannistraro.

Disciplinary Rule 5–102 of the Code of Professional Responsibility provides:

> (A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he [or she] or a lawyer in his [or her] firm ought to be called as a witness on behalf of his [or her] client, he [or she] shall withdraw from the conduct of the trial and ... should not continue representation in the trial....

> (B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he [or she] or a lawyer in his [or her] firm may be called as a witness other than on behalf of his [or her] client, he [or she] may continue the representation until it

is apparent that his [or her] testimony is or may be prejudicial to his [or her] client.

DR 5–102; *see also Wheat,* 486 U.S. at 162, 108 S.Ct. at 1698–99 (citing with approval, defense counsel's need to conform with ABA Code of Professional Responsibility).

If Cannistraro calls Pollack as a witness, DR 5–102(A) requires that Pollack withdraw as counsel.[11] Similarly, if either the Government or Bertoli calls Pollack as a witness, DR 5–102(B) requires Pollack to be disqualified as counsel if it appears his testimony would prejudice Cannistraro.

Prejudice to the client has been found when the mere presence of defense counsel at trial would distort the fact-finding process or when defense counsel would become an unsworn witness. *See e.g., Zepp,* 748 F.2d at 138–39 ("trial counsel was required to withdraw regardless of whether his testimony would be exculpatory or inculpatory"); *Jacobs,* 1992 U.S.Dist. LEXIS 530, *6–7 (Jury hearing testimony suggesting involvement of defense counsel in underlying transactions "would be bound to evaluate anything he said through the prism of such testimony, discounting or enhancing his arguments depending on the jury's conclusions about and reactions to his motives and/or his awareness of the underlying facts."); *Gotti,* 771 F.Supp. at 561–63 (regardless of whether defense counsel are called as witnesses to testify about receipt of benefactor payments, they could not present defense of charge that defendant made benefactor payments as head of criminal enterprise, without appearing as unsworn witnesses); *Melo,* 702 F.Supp. at 943 (mere presence of defense counsel as trial counsel may create appearance of impropriety because Government will introduce tape concerning defense counsel's participation in alleged conspiracy).

In this case, the Government has expressed its intention to introduce the In-

---

**10.** At oral argument Bertoli stated: "In the event that Mr. Pollack continues to represent Mr. Cannistraro, I will waive calling Mr. Pollack as a witness." Oral Arg.Tr. at 17.

**11.** At oral argument, counsel to Pollack represented Cannistraro would waive his right to call Pollack as a witness. Oral Arg.Tr. at 12–13. Waiver as an alternative to disqualification is discussed below. *See infra* p. 1327.

demnity Agreement as proof that the Centurion funds were transferred from the Cayman Islands to Andorra.[12] Pollack will likely be afforded an opportunity to conduct an examination with respect to the Indemnity Agreement and in so doing he will become or appear to be an unsworn witness in the case. Moreover, in light of the fact that Pollack has witnessed Cannistraro's signature, Pollack is necessarily connected to the events underlying the facts charged in the Second Superseding Indictment.

Regardless of who calls Pollack as a witness or if Pollack becomes a witness at trial, the mere presence of Pollack may create an appearance of impropriety to the jury. Accordingly, there is a strong possibility of prejudice to Cannistraro. The Motion to Disqualify Pollack is justified on this basis.

Even if the testimony of Pollack were relevant only to the case against Bertoli, disqualification is not limited to the situation where the counsel's knowledge of facts is of his or her client's case. Indeed, the purpose of disqualification is to preclude a subsequent allegation of ineffective assistance of counsel. Cannistraro and Bertoli will have the same jury.[13] Accordingly, the jury would hear the testimony of Pollack in the case against Bertoli.

If the jury is aware of Pollack's knowledge of the facts underlying Bertoli's indictment, they may draw inferences or arrive at conclusions relating to Pollack's representation of Cannistraro which may dis-

tort the fact finding process. Accordingly, Cannistraro could formulate an ineffective assistance of counsel claim if Pollack were to serve as his trial counsel.

Pollack contends that to the extent the Government intends to call him as a witness, any testimony he would offer would be duplicative. Opp.Brief at 13–14. Pollack fails to recognize, however, that his testimony could be used to corroborate evidence the Government may have on the issue of control of the Cayman Islands accounts.

An actual conflict of interest will arise because, as mentioned, when the Indemnity Agreement is introduced at trial, Pollack will become an unsworn witness. In addition, a potential conflict of interest exists because the Government, Cannistraro or Bertoli may call Pollack to testify.[14] Accordingly, after an evaluation of the facts and circumstances of this case, disqualification of Pollack is appropriate and is not violative of Cannistraro's Sixth Amendment right to counsel of choice.

2. Prior Representation of Lugo

■ The Government argues that an additional factor weighing in favor of disqualifying Pollack as Cannistraro's defense counsel is Pollack's prior representation of Lugo. Moving Brief at 14–17; Reply Brief at 15–17. The Government states Lugo is a potentially important Government witness. Moving Brief at 14. It states Lugo has proffered he will invoke his attorney client privilege if cross-examined by Pol-

---

**12.** Pollack relies on the fact that the Government has not made an affirmative statement that it will call Lugo as a witness. Opp.Brief at 8; Oral Arg.Tr. at 7, 10. At oral argument, the Government represented there is a fifty percent chance it would call Lugo to testify at trial, but that it was a "situational call that will be made probably during trial or just prior to trial." *Id.* at 10. Regardless of whether Lugo is called as a prosecution witness, the Government has expressed its intent to introduce the Indemnity Agreement. Once the Indemnity Agreement is introduced, Pollack will necessarily become an unsworn witness because his signature is on the Indemnity Agreement.

Moreover, Pollack's argument that the Motion to Disqualify cannot be grounded on the proffered testimony of a "potential" witness, Opp.

Brief at 8, overlooks the holding of the Supreme Court in *Wheat* that a potential conflict of interest arising during trial is sufficient to disqualify counsel. 486 U.S. at 163–64, 108 S.Ct. at 1699–1700. As illustrated, the potential of a conflict of interest in this case is serious.

**13.** *See infra* pp. 1324–1327 (denying request for severance).

**14.** Although Pollack has refused to be interviewed by the Government, *see* Oral Arg.Tr. at 12, and Bertoli and Cannistraro have expressed their intent not to call Pollack, *id.* at 12–13, 17, these statements were made outside the context of the trial. Once confronted with the unpredictable circumstances of a trial, the parties' intent not to call Pollack may change.

lack. *Id.* at 16–17. Pollack argues the Government has not definitively stated it intends to call Lugo as a witness and disqualification should not result absent an absolute statement from the Government. Opp.Brief at 20–21. In addition, Pollack argues he represented Lugo on matters unrelated to the Second Superseding Indictment. *Id.* at 20.

"An attorney's duty of loyalty and confidentiality to his [or her] clients continues even after the termination of the attorney-client relationship. It does not end until the former client releases the attorney from that duty or waives any interest in the continued protection of privileged communications." *United States v. Stout,* 723 F.Supp. 297, 309 (E.D.Pa.1989); *see also United States v. Calabria,* 614 F.Supp. 187, 192 (E.D.Pa.1985); Model Code of Professional Responsibility, Canon 4.

"Conflicts of interest arise whenever an attorney's loyalties are divided, and an attorney who cross-examines former clients inherently encounters divided loyalties." *Moscony,* 927 F.2d at 750 (citations omitted); *see also Calabria,* 614 F.Supp. at 192. When the Government calls a witness whom defense counsel has previously represented, a conflict of interest arises because defense counsel has a duty to vigorously cross-examine the witness and may reveal confidential information in the process. In the alternative, defense counsel may breach his duty to vigorously represent the defendant in fear of divulging confidences of the Government witness. *See Moscony,* 927 F.2d at 748–750; *United States v. Jones,* 623 F.Supp. 110, 114 (E.D.Pa.1983).

In *Moscony,* the court disqualified defense counsel because he had previously represented Government witnesses during the grand jury investigation. 927 F.2d at 751. In *United States v. Montevecchio,* 645 F.Supp. 497 (W.D.Pa.1986), defense counsel was disqualified because he had previously represented, in unrelated matters, two Government witnesses who stated they would invoke their attorney-client privilege. *Id.* at 499–500. The court stated:

> The credibility of these witnesses will be under attack and we are informed that the government relies heavily on their testimony.... In such a situation the interest of justice could be frustrated on both sides; the public interest in a fair trial, and the defendant's interest if defense counsel is unable to cross examine two of the government's critical witnesses.

*Id.* at 500.

In this case, although the Government has not stated it definitely intends[15] to call Lugo as a witness, if called, credibility of Lugo will be at issue.[16] The conflict of interest which will arise if Lugo testifies and the conflict of interest resulting from the Pollack's knowledge of the underlying events are sufficient to require Pollack be disqualified as Cannistraro's trial counsel.

### 3. Grand Jury Investigation

■ The Government argues a final factor weighing in favor of disqualification of Pollack is the fact that Pollack is the subject of an unrelated grand jury investigation. Moving Brief at 17; Reply Brief at 18–20. The Government argues:

> [T]he possibility or perception could arise that Pollack might seek to gain favor with the Government in his own case by taking or by not taking certain actions, or by offering a compromise in Cannistraro's criminal prosecution, that would not be in Cannistraro's best interests. Absent an adequate waiver of this potential conflict, Cannistraro could have a colorable claim that he received ineffective assistance of counsel.

Moving Brief at 17; Reply Brief at 19.[17] Pollack argues the Government's argument

---

**15.** At oral argument the Government stated there was a fifty percent chance it would call Lugo. Oral Arg.Tr. at 10.

**16.** Pollack has already questioned Lugo's reliability in his opposition to this motion. Opp. Brief at 8.

**17.** Prior to the discovery of the Cayman Islands evidence and Lugo's proffer of testimony, it

is "disingenuous" because the Government has actively attempted to persuade Cannistraro to plead guilty and cooperate. Opp. Brief at 29.

A claim for ineffective assistance of counsel may be grounded on the fact that defense counsel was under investigation by the prosecution at the same time he was representing the defendant. *See, e.g., Briguglio v. United States*, 675 F.2d 81 (3d Cir.1982). In *Briguglio*, a habeas corpus petition was filed on the ground that at the time the defendant entered a guilty plea, his defense counsel was under a grand jury investigation by the same district attorney's office. *Id.* at 82. The court recognized that petitioner had "raise[d] a clear possibility of 'actual conflict,' 'actual effect on the adequacy of representation,' and 'prejudice,' " but declined to decide the issue because the record was devoid of a hearing on the issues. *Id.* at 83.

While the conflict of interest arising from the grand jury investigation of Pollack alone may not be a basis to disqualify Pollack, this conflict of interest together with the conflict of interest arising from Pollack's knowledge of facts underlying some of the charges in the Second Superseding Indictment and the conflict of interest arising if Lugo testifies, warrant the disqualification of Pollack. The Motion to Disqualify is granted.

### B. *Alternatives to Disqualification*

#### 1. Severance

Pollack argues severance of the trial pursuant to Rule 14 of the Federal Rules of Criminal Procedure is a viable alternative which would preserve the right of Cannistraro to counsel of choice. Opp.Brief at 14–15. Pollack argues severance would cure any appearance of impropriety of his involvement in the obstruction of justice charges. *Id.* Pollack argues the delay caused by substituting counsel, alone, will require severance of trial in order to protect Bertoli's right to a speedy trial. *Id.* at 32. Pollack also argues severance will avoid the additional costs which Cannistraro will incur in hiring counsel to become familiar with the abundance of facts and legal issues. *Id.* at 31.

Rule 14 of the Federal Rules of Criminal Procedure provides: "If it appears that a defendant is prejudiced by a joinder of offenses or of defendants in an indictment . . ., the court may order . . . separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." Fed.R.Crim.P. 14.

Although the request for severance is made under Fed.R.Crim.P. 14, Rule 8 of the Federal Rules of Criminal Procedure merits consideration. Rule 8 permits joinder of offenses and defendants.[18] Joinder of offenses and defendants promotes economy of judicial and prosecutorial resources, as well as the public interest in avoiding expensive and duplicative trials. *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 *reh'g denied*, 475 U.S. 1104 (1986); *United States v. Gorecki*, 813 F.2d 40, 42 (3d Cir.1987); *United States v. Jackson*, 649 F.2d 967, 973 (3d Cir.), *cert. denied*, 454 U.S. 1034, 102 S.Ct. 574, 70 L.Ed.2d 479 (1981). When distinct offenses have both a logical and temporal relationship, joinder permits the Government to present its evidence in an efficient manner. Such evidentiary overlap "strong-

---

appears the Government may have been willing to accept a waiver of the conflict of interest arising from the unrelated grand jury investigation. Moving Brief at 17, 19; Reply Brief at 18.

**18.** *Rule 8 provides:*
 (a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
 (b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.
Fed.R.Crim.P. 8.

ly counsels in favor of joinder." *United States v. McDonnell*, 699 F.Supp. 1348, 1351 (N.D.Ill.1988) (citing *United States v. Shue*, 766 F.2d 1122, 1134 (7th Cir.1985), *cert. denied*, 484 U.S. 956, 108 S.Ct. 351, 98 L.Ed.2d 376 (1987)).[19] This rationale applies with equal force to the joinder of defendants. *United States v. Dickens*, 695 F.2d 765, 778–79 (3d Cir.1982), *cert. denied sub nom.*, 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983).

■ When, as here, the literal requirements of Rule 8 are met, a presumption arises in favor of joinder. *See United States v. Swift*, 809 F.2d 320, 322 (6th Cir.1987) (Rule 8(b) "can, and should, be 'broadly construed in favor of initial joinder' ....") (quoting *United States v. Isaacs*, 493 F.2d 1124, 1158 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974)). Indeed, there is a presumption against severance because it is "assum[ed] that closely related charges are being tried together...." *United States v. Velasquez*, 772 F.2d 1348, 1355–56 (7th Cir.1985), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986); *see United States v. Serubo*, 604 F.2d 807, 819 (3d Cir.1979); *United States v. Wofford*, 562 F.2d 582, 585 (8th Cir.1977) ("Ordinarily, if defendants are jointly indicted and similar evidence from the related series of events is used to convict each defendant, the defendants should be tried together."), *cert. denied*, 435 U.S. 916, 98 S.Ct. 1471, 55 L.Ed.2d 507 (1978).

■ If, however, offenses or defendants have been improperly joined, severance is required as a matter of law under Rule 8. *United States v. Andrews*, 765 F.2d 1491, 1496 (11th Cir.1985) ("Misjoinder under Rule 8(b) is prejudicial per se...."), *cert. denied sub nom.*, 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986); *United States v. Bledsoe*, 674 F.2d 647, 654 (8th Cir.) ("[M]isjoinder of defendants is inherently prejudicial."), *cert. denied sub nom.*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982); *Vastola*, 670 F.Supp. 1244, 1261 (D.N.J.1987) (citing *United States v. Som-*

*ers*, 496 F.2d 723, 729 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974)), *aff'd in part, rev'd in part*, 899 F.2d 211 (1990).

■ When a number of offenses are joined in one indictment or multiple defendants are jointly charged with a single offense, "[s]ome prejudice almost necessarily results." *Vastola*, 670 F.Supp. at 1261 (quoting *Cupo v. United States*, 359 F.2d 990, 993 (D.C.Cir.1966), *cert. denied*, 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967)). This level of prejudice, however, is permissible so long as the technical strictures of Rule 8 are met. Thus, Rule 8(b) is generally satisfied if the indictment charges a single conspiracy. *United States v. Cole*, 717 F.Supp. 309, 317 (E.D.Pa.1989), *aff'd, sub nom, U.S. v. Spanjol*, 1992 U.S.App. LEXIS 4382 (3d Cir.1992); *United States v. DiPasquale*, 561 F.Supp. 1338, 1347 (E.D.Pa.1983), *aff'd*, 740 F.2d 1282 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985).

Cannistraro does not contest joinder under Rule 8. Rather, he argues joinder would be unduly prejudicial under Rule 14. Severance under Rule 14 is within the discretion of the trial court. *United States v. Eufrasio*, 935 F.2d 553, 568 (3d Cir.), *cert. denied sub nom.*, — U.S. —, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991); *United States v. Boyd*, 595 F.2d 120, 125 (3d Cir.1978).

■ Rule 14 authorizes a trial court to sever counts or defendants where, despite an indictment's technical compliance with Rule 8, joinder would result in a "manifestly unfair trial." *Vastola*, 670 F.Supp. at 1261 (citing *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir.1981)). A defendant bears a heavy burden when he or she moves for severance under Rule 14. *See Eufrasio*, 935 F.2d at 568; *United States v. Sandini*, 888 F.2d 300, 305 (3d Cir.1989), *cert. denied*, 494 U.S. 1089, 110 S.Ct. 1831, 108 L.Ed.2d 959 (1990); *United States v. De Peri*, 778 F.2d 963, 983 (3d Cir.1985), *cert. denied sub nom.*, 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); *United States v. DiPasquale*, 740 F.2d 1282, 1293 (3d Cir.1984), *cert. denied*, 469 U.S. 1228,

---

**19.** Although *McDonnell* addresses joinder of offenses under Rule 8(a), the underlying policy considerations of joinder pursuant to Rules 8(a) and (b) are similar.

105 S.Ct. 1226, 84 L.Ed.2d 364 (1985). Mere allegations of prejudice are insufficient to meet this burden. A defendant "must demonstrate 'clear and substantial prejudice.'" *Gorecki,* 813 F.2d at 43 (quoting *United States v. Sebetich,* 776 F.2d 412, 427 (3d Cir.1985), *cert. denied,* 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988)); *United States v. Wright–Barker,* 784 F.2d 161, 175 (3d Cir.1986). A showing of prejudice cannot rest on the fact that "all evidence adduced is not germane to all counts against each defendant." *Eufrasio,* 935 F.2d at 568 (citing *Sandini,* 888 F.2d at 307). "[N]either a disparity in evidence nor the introduction of evidence more damaging to one defendant than another entitles the seemingly less culpable defendant to severance.'" *Sebetich,* 776 F.2d at 427 (quoting *United States v. Simmons,* 679 F.2d 1042 (3d Cir.1982)).

In determining whether to sever a trial, the "court should balance the public interest in joint trials against the possibility of prejudice inherent in the joinder of defendants." *Eufrasio,* 935 F.2d at 568 (citing *De Peri,* 778 F.2d at 984). Joint trials "conserve [public] funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial." *Bruton v. United States,* 391 U.S. 123, 143, 88 S.Ct. 1620, 1631–32, 20 L.Ed.2d 476 (1968). Moreover, "[j]oint trials generally serve the interest of justice by avoiding inconsistent verdicts and ... advantages which sometimes operate to the defendant's benefit." *Richardson v. Marsh,* 481 U.S. 200, 210, 107 S.Ct. 1702, 1708–09, 95 L.Ed.2d 176 (1987).

Significantly, the "public interest in judicial economy favors joint trials where the same evidence would be presented at separate trials of defendants charged with a single conspiracy." *Eufrasio,* 935 F.2d at 568. The general rule is that defendants jointly indicted should be jointly tried. *Id.; Sandini,* 888 F.2d at 306; *Sebetich,* 776 F.2d at 427.

█ In support of the request for severance, Cannistraro relies on the possibility that Pollack would be required to testify for or against Bertoli in Bertoli's case and would not be required to testify for or against Cannistraro. As previously discussed, however, Pollack's knowledge of the events underlying transfer of Centurion funds is relevant to Cannistraro's case as well. *See supra,* pp. 1320–1321. Moreover, it appears the Indemnity Agreement will be introduced in Cannistraro's case. Accordingly, even if the Government and Cannistraro do not call Pollack in Cannistraro's case, in light of the fact that Pollack signed the Indemnity Agreement, his presence will create an appearance of impropriety to the jury.

Moreover, both Cannistraro and Bertoli have been indicted on the same RICO, conspiracy to violate RICO and securities laws charges. The charges have been classified as complex and involving novel issues of law. The trial is projected to last two to four months.[20] Severance of the trial will, therefore, result in a gross waste of judicial resources, time and effort. The substantial public interest in judicial economy as well as the inability to eliminate the appearance of impropriety in Cannistraro's case, outweighs any prejudice to Cannistraro as a result of the disqualification of Pollack.

---

**20.** This case is not slated to go to trial until the fall of this year. Currently pending before the court are the motions filed by Bertoli and Cannistraro to dismiss the Second Superseding Indictment for prosecutorial misconduct or in the alternative for discovery of grand jury materials, to dismiss the Second Superseding Indictment for pre-indictment delay and for selective vindictive prosecution, to preclude Cayman Islands depositions, to dismiss the Second Superseding Indictment on the grounds that the RICO and conspiracy charges are barred by the statute of limitations, to dismiss Counts One, Two and Seven of the Second Superseding Indictment for failure to state an offense and to dismiss Count Seven for reasons that the court deems proper. Bertoli has submitted a 140–page moving brief which is joined by Cannistraro. The Government has submitted a 132–page brief in opposition to these motions. The reply briefs of Bertoli and Cannistraro have not been submitted as of the date of this opinion. The motion to preclude the Cayman Islands depositions attacks the deposition testimony in general and does not attack the admissibility of specific evidence obtained in the Cayman Islands. Therefore, a round of pretrial evidentiary motions relating to specific evidence is also expected. Accordingly, substitute counsel will have ample time to prepare for trial.

### 2. Waiver of Conflicts of Interest

Pollack also argues Cannistraro is prepared to waive any conflict of interest that may arise. Opp.Brief at 32. Specifically, Pollack argues Cannistraro is willing to waive cross-examination of Lugo if he testifies. *Id.* at 24, 26, 28; Oral Arg.Tr. at 4–5. Pollack argues Cannistraro also has agreed to waive any conflict of interest arising from the independent grand jury investigation of Pollack. *Id.* at 30.

■ As discussed, the Supreme Court has recently stated a trial court need not accept a defendant's waiver of a conflict of interest. 486 U.S. at 162–63, 108 S.Ct. at 1698–99. Cannistraro's level of education is not at issue here, as he is educated and intelligent individual. Indeed, at oral argument, counsel to Pollack represented Cannistraro had read all of the submissions of the Government and reviewed them with independent counsel as well Pollack. Oral Arg.Tr. at 10, 13–16. Counsel to Pollack represented that Cannistraro was, therefore, apprised of the problems associated with his choice of counsel.[21]

The issue, however, is the ability of Cannistraro to make an objective decision unclouded by the emotional aspects associated with criminal charges. As recognized in *Wheat:*

> A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics. Nor is it amiss to observe that the willingness of an

attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.

486 U.S. at 163, 108 S.Ct. at 1699.

■ This is a complex case and the dynamics of the trial are, to be sure, unpredictable. In light of the complexity of the case and the magnitude of the potential conflicts of interest in this case, waiver is inappropriate.[22]

### Conclusion

For the reasons set forth above, the Motion to Disqualify is granted.

---

**21.** The colloquy at oral argument was as follows:

> The Court: So you're satisfied that not only did Mr. Pollack apprise him [Cannistraro] of the problems, not only did the Government's papers apprise him of the problems, but independent attorney apprised him of the problem?
>
> Mr. Barry: That is correct, your Honor.

Oral Arg.Tr. at 16; *see also id.* at 14.

**22.** Moreover, this is not a situation where the Government has tried to manufacture a conflict

to prevent Cannistraro from having his selected counsel. *See id.* at 163, 108 S.Ct. at 1699. (warning trial courts of possibility of Government fabricating conflicts). Indeed, it appears prior to the discovery of the Indemnity Agreement and Pollack's knowledge of events relevant to the Second Superseding Indictment, the Government was willing to agree to a waiver by Cannistraro of the conflict of interest concerning Pollack's status as a target of a grand jury investigation. Moving Brief at 19.